**Affirmed and Opinion Filed November 14, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-01200-CV

**HIGHLAND CREDIT OPPORTUNITIES CDO, L.P., Appellant**
**V.**
**UBS AG, Appellee**

**On Appeal from the 192nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 10-16004**

## OPINION

Before Justices FitzGerald, Fillmore, and Stoddart
Opinion by Justice FitzGerald

This case involves distressed debt trading. The appeal follows a bench trial on Highland Credit Opportunities CDO, L.P.'s ("Highland LP") breach of contract claim against UBS AG ("UBS") in which the trial court rendered a take-nothing judgment against Highland LP. In six issues, Highland LP asserts: (1) the trial court erred in concluding time was not of the essence under the contract; (2) the trial court erred in ruling that UBS did not commit a material breach of the contract; (3) whether Highland LP was ready, willing, and able to perform the contract is not an element of Highland LP's breach of contract claim; (4) alternatively, Highland LP was ready, willing, and able to perform the contract; (5) the trial court erred in concluding that Highland LP's damages were not foreseeably caused by the breach; and (6) the trial court erred

in concluding that Highland LP breached the contract by delaying settlement of the trade. Concluding Highland LP's arguments are without merit, we affirm the trial court's judgment.

## BACKGROUND

Highland LP, a limited partnership formed under the laws of Delaware, is a hedge fund engaged in the purchase and sale of commercial loans in the secondary loan market. Highland Credit Opportunities CDO, Ltd. ("Highland Ltd.") is a limited partnership formed under the laws of the Cayman Islands. Highland Ltd. holds assets on behalf of Highland LP, its beneficial owner. Highland LP is also known as the "master fund."[1]

UBS, a corporation formed under the laws of Switzerland, maintains a branch office in Dallas, Texas. UBS is a global investment bank that trades commercial loans in the secondary loan market.

The dispute arises out of an agreement between Highland Ltd. and UBS to engage in a distressed loan trade. Generally, distressed loans are perceived to be at risk for full repayment, and trade at various discounts depending on the market's assessment of the risk. In this instance, the distressed loan trade between UBS and Highland Ltd. involved the purchase and sale of a portion of debt owed by KIK Custom Products, Inc. ("KIK").

The transaction has its genesis in the debt incurred by KIK. On May 24, 2007, KIK borrowed $465 million from various lenders and entered into a First Lien Credit Agreement (the "Credit Agreement"). The Credit Agreement specified the rights and obligations of the first-lien lenders and the mechanics by which those interests could be transferred to another party. The Credit Agreement provided that such rights and obligations could be assigned to third parties who purchased portions of the KIK debt on the secondary market. Purchasers could then retain the debt (known as "taking a position" in the debt), or sell the debt to another "downstream"

---

[1] Both Highland entities are referred to as "Highland" unless differentiation is required for context.

third party. To settle a trade by assignment, sellers must provide buyers with the chain of documentation that traces the ownership of the debt back to the original lender.

On March 26, 2008 UBS purchased a portion of the KIK debt from Katonah VII CLO in an upstream trade (the "Upstream Trade"). In the distressed loan market, an "upstream trade" refers to a trade in which a seller acquires ownership of debt to pass it on to another buyer. On March 27, 2008, Highland Ltd. and UBS orally agreed that Highland Ltd. would purchase the KIK debt from UBS. Specifically, Highland Ltd. agreed to purchase from UBS $1,995,000 of first-lien KIK debt at a purchase rate of 71% or 71 cents on the dollar for a purchase price of $1,416,450 (the "KIK Trade").

As is customary in the industry, the parties' oral agreement was memorialized in a trade confirmation. The trade confirmation reflected the material terms of the trade on a standard form provided by the Loan Syndication Trading Association ("LSTA"). The LSTA, a non-profit trade association, offers guidance and standardized forms to parties engaged in distressed loan trades, but it does not govern or regulate such trades. In fact, the parties are free to modify the standard confirmation form as appropriate to the transaction. The LSTA trade confirmation form incorporated Standard Terms and Conditions for Distressed Trade Confirmation that were in effect at the time of the trade (the "Standard Terms"). Thus, the contract at issue here consists of the trade confirmation and the Standard Terms (together, the "Contract").

The trade confirmation provided that the trade was subject to "negotiation, execution, and delivery of reasonably acceptable contracts and instruments of transfer." The Standard Terms advise that trades should be settled "as soon as practicable after the Trade Date." After a loan trade has been agreed upon, there is a period of time between the trade date and the closing of the transaction called the "settlement period." During the settlement period, closing details are provided and the transaction is documented prior to the parties' exchange of funds. Three

documents are required for settlement: the purchase and sale agreement, the assignment and assumption agreement, and the purchase price letter (collectively, the "Closing Documents"). Ordinarily, a trade involves preliminary pricing and then final pricing. The purchase price letter is the document containing the final calculation of the purchase price. In most cases, the agent bank (also known as the administrative agent) must approve the trade, and in some cases, the borrower must approve prior to closing. Here, the Credit Agreement required the administrative agent for the underlying loan to KIK to approve and record each assignment of KIK debt. In the settlement of a trade, once the administrative agent approves the transaction, and the parties finalize the purchase price letter, the buyer sends the agreed upon payment to the seller via wire transfer.

Settlement periods are measured with the industry nomenclature of "T+X." In this formula, "T" represents the trade date, and the "x" number that follows represents the number of business days following the trade date. The Standard Terms suggest that distressed loan trades be settled within T+20, which is twenty business days after the trade date. The LSTA's User's Guide for LSTA Distressed Trading Documentation ("User's Guide") summarizes the recommended guidelines for various steps in the settlement of distressed trades. The User's Guide states that the dates for the transmittal of documents by the seller are not definitive, but rather serve as a recommended framework.

Shortly after the KIK Trade, the market price for KIK first-lien debt dropped well below Highland's 71% purchase rate, and did not recover until the latter part of 2009. At the same time, Highland experienced financial difficulties and the overall market was in a state of decline. UBS maintains that Highland deliberately "played the market," delaying the settlement of the KIK

Trade and other trades to address liquidity problems resulting from margin calls.[2] Highland claims that throughout 2008-2010, Highland Ltd., "the financing vehicle," had sufficient available cash to close the trade. Regardless, the KIK Trade did not close within T+20, or at any other time.

The Standard Terms recommend that a buyer provide the seller with "allocations" within T+2. Despite the trade date of March 27, 2008, Highland Ltd. did not provide UBS with such allocations until April 7, 2008.[3] In fact, from March 28 through April 7, Highland Ltd. did not recognize the trade, and told UBS that it did not exist. But on April 7, 2008, Highland Ltd. finally acknowledged the KIK Trade.

On April 10, 2008 and again on April 28, 2008, UBS provided draft Closing Documents to Highland Ltd. and requested that Highland provide the administrative details necessary to close the trade. UBS also notified Highland of UBS's pending Upstream Trade.

On May 8, 2008, Highland's attorney provided UBS with the administrative details necessary to finalize the Closing Documents, and said that the Closing Documents "look good." In the same correspondence, Highland's counsel inquired whether UBS was "waiting on anything else from [him]." Highland requested the information on the Upstream Trade, and UBS advised that the upstream trade had not yet closed. The UBS Upstream Trade closed on May 15, 2008. Approximately fourteen days later, on May 29, 2008, UBS sent Highland the final execution versions of the Closing Documents along with the documentation pertaining to the Upstream Trade. On May 30, 2008, Highland's attorney responded, "The documents look good. Please send pricing." UBS provided Highland with proposed pricing on June 24, 2008, and

---

[2] Evidence in the record explains that in the hedge fund industry, a fund may often borrow capital to purchase additional securities. This is accomplished through the use of "margin." Lenders typically require a fund to maintain "minimum margin requirements." If the value of the fund's securities fall below a certain point, the lender may issue a "margin call" requiring a fund to sell its positions or move additional cash into the fund to meet minimum funding requirements.

[3] The parties failed to define the term "allocations" at trial. However, the exhibits reflect that the term refers to identification of the specific fund(s) approving or funding the purchase.

requested signatures on the Closing Documents. UBS informed Highland that the pricing would be updated to "whatever closing date is agreed upon."

On July 2, 2008, Highland provided signatures on the Closing Documents. Thus, the only step remaining to close the trade was for Highland to consent to delivery of the Closing Documents to the administrative agent for final approval. UBS contacted the agent to determine its schedule for approving the trade, and then on July 7 informed the Highland representative and requested a funding deadline. The Highland representative reported that Highland had a 2:00 p.m. CST deadline to fund. However, ten minutes later, Highland's counsel informed UBS that "Highland will not be able to close today. I will update you on their ability to close."

On July 16, 2008, counsel for UBS sent an email inquiring about whether Highland was prepared to settle the trade. On July 22, 2008, UBS counsel wrote to Highland stating, "I do not mean to be pushy, but I have an eager client who wants me to get this trade wrapped up." Two days later, counsel for Highland replied, "as for closing date, we may have more clarity tomorrow." On August 15 and again on August 25, counsel for UBS inquired about settlement of the trade. Highland did not respond.

On September 3, 2008, Douglas Gervolino, UBS's closer, emailed Carter Chism, Highland's closer, "I just need you to confirm that you can close and we will send the AA to the agent. Please respond." On September 8, 2008, counsel for UBS asked Highland's counsel if there was any further information concerning settlement status. Highland's counsel replied, "Not yet. I will check again."

In communications between counsel on September 17, Highland's counsel reported that he did not have the "green light" to close. Counsel for UBS asked about the reasons for delay, and further inquired if there was anything that could be done to expedite the process. On

September 18, Gervolino sent Highland an email stating, "Can we please close this week? If not, what is preventing us from closing?" Highland did not respond.

However, sometime during the September-October 2008 timeframe, Highland's counsel did propose a "partial net" of the trade.[4] UBS declined to accept this proposal.

By letter dated October 17, 2008, UBS contacted Highland and advised that settlement of the trade had not yet occurred "notwithstanding . . . repeated efforts to make the necessary arrangements with Highland." UBS enclosed documentation on which Highland's signature had been previously requested, and asked that it be returned by October 24, 2008 to submit to the administrative agent for approval. UBS further stated that once the agent's approval had been received, UBS would proceed to settlement in accordance with the Standard Terms. UBS advised that it would pursue all available legal remedies if the signed agreement was not received. A similar letter was sent on October 30, 2008, requesting signature on the necessary agreements by November 7, 2008. UBS advised that Highland's failure to do so would be considered an anticipatory repudiation of the trade.[5] The trade did not close.

On November 7, 2008, Highland responded to UBS's communications, stating that Highland:

> has every intention and ability to perform its obligations under the confirmations and settle the applicable transaction . . . [P]lease accept this letter as [Highland's] unequivocal and reasonable assurance of its willingness and ability to perform its obligation . . . .

On November 8, 2008, the trade confirmation was revised to reflect the internal reallocation of the trade from Highland Ltd. to Highland LP. Although trial testimony established that the seller is the party who typically fills in the terms of a trade on a trade

---

[4] The parties described the partial net offer as one where part of the consideration for the trade would be satisfied by stepping into the counterparty's shoes in another trade and receiving the economic benefit of that other trade. A partial netting agreement would have involved only a partial settlement, with UBS receiving less than the full price agreed for the trade.

[5] In addition to the KIK Trade, the October 30 letter also referenced two other unsettled Highland trades.

confirmation, the record is not clear as to which party completed the revised trade confirmation. On the revised trade confirmation, the original trade date of March 27 remained the same. The parties continued to exchange communications about closing the trade through August 19, 2009, but the KIK Trade did not close.

In August or September 2009, UBS engaged in a "sell out," and sold the KIK debt to Apollo, another hedge fund.[6] On October 19, 2009, counsel for Highland sent an email to counsel for UBS, indicating that Highland was "now ready to settle this trade." By this time, the price of the KIK debt on the secondary market had recovered to above 71 cents on the dollar. The KIK Trade did not close.

Highland LP subsequently initiated this lawsuit against UBS. Highland Ltd. joined as a plaintiff in the second amended petition. Both parties moved for summary judgment prior to trial. The trial court denied both motions as to the breach of contract claim, but granted UBS's motion on Highland's claims for tortious interference, fraud, and alter ego. Thus, only the breach of contract claim remained for trial.

After the joinder of Highland Ltd., there was considerable confusion as to whether Highland Ltd. or Highland LP was the proper plaintiff. Five days before trial, the parties filed a Rule 11 agreement in which they agreed that the issue of whether Highland LP was the proper contracting party remained outstanding. On the day of trial, Highland Ltd. non-suited its claims. The case was tried to the bench with only Highland LP remaining as a plaintiff. Highland LP is the only Highland entity that is a party to this appeal.

---

[6] A "sell out" is an industry term that refers to a party's right to enter into a cover transaction if the counterparty delays a distressed debt trade.

The trial court concluded that Highland failed to prove its breach of contract claim and signed a take-nothing judgment against Highland. Following the entry of judgment, the trial judge made findings of fact and conclusions of law. Highland timely perfected this appeal.

## ANALYSIS

*Standing.*

UBS argues the appeal should be dismissed because Highland has no standing. Specifically, UBS asserts that Highland Ltd., not Highland LP, was the original party to the Contract and there is no competent evidence of an assignment. Highland responds that UBS has waived its right to complain about standing because it did not file a cross-appeal. Both parties' contentions are without merit.

Standing is a component of subject-matter jurisdiction.[7] A court has no jurisdiction over a claim made by a plaintiff who lacks standing to assert it.[8] Because standing is jurisdictional, it cannot be waived.[9]

The concept of standing is frequently confused with the concept of capacity. The distinction, however, is significant. "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome, whereas the issue of capacity 'is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate.'"[10] "A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy."[11]A plaintiff

---

[7] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993).

[8] *See Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012).

[9] *Austin Nursing Ctr. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005).

[10] *Id.*

[11] *Id.* at 848–49.

with no legally cognizable interest in the outcome of the case lacks standing to sue on its own behalf, but may be authorized to sue on behalf of another.[12]

The question UBS raises with regard to whether Highland is entitled to sue on the Contract is a question of capacity.[13] When the issue involves capacity arising from a contractual right, "Texas law is clear, and this court has previously held numerous times, that a challenge to a party's privity of contract is a challenge to capacity, not standing."[14]  For example, in *National Health Resources Corp. v. TBF Financial, LLC*,[15] this court concluded that whether a party was the assignee of a lease between the signatory parties was not an issue of standing, but whether the alleged assignee could recover in the capacity which it sued.[16] As this court observed, "[w]hether a party is entitled to sue on a contract is not truly a standing issue because it does not affect the jurisdiction of the court; it is, instead, a decision on the merits."[17] Thus, "when it is established that a breach of contract plaintiff lacks entitlement to sue on a contract, the proper disposition may be summary judgment on the merits, but it is not dismissal for want of jurisdiction."[18]

---

[12] *See Nootsie Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996).

[13]  Neither party advises whether New York law or Texas law should be applied to this issue. When a party fails to establish the content of the law in a foreign state, the law is presumed to be the same as the law in Texas. *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 53 (Tex. 2008); *see also El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 144 n.26 (Tex. 2012) (presuming that Texas law and New York law were the same because the parties pointed to no material differences between them). Therefore, we apply Texas law to the question of capacity. *See Spurgeon v. Coan & Elliot*, 180 S.W.3d 593, 596–98 (Tex. App.—Eastland 2005, no pet.) (determining whether "Coan and Elliot, Attorneys at Law" could sue for legal fees owing to "Coan and Elliot, LLP" without proof of assignment of claim involved issue of capacity)

[14] *Transcontinental Realty Investors, Inc. v. Wicks*, No. 05-13-00362-CV, 2014 WL 3827901, at *2 (Tex. App.—Dallas, Aug. 5, 2014, no pet. h.).

[15] 429 S.W.3d 125, 129 (Tex. App.—Dallas 2014, no pet.).

[16] *Id*. at 129.

[17] *Id.* (quoting *Heartland Holdings Inc. v. U.S. Trust Co. of Tex. N.A.*, 316 S.W.3d 1, 6–7 (Tex. App.—Houston [14th Dist.] 2010, no pet.)).

[18]  *Id.*; *see also Yasuda Fire & Marine Ins. Co. v. Criaco,* 225 S.W.3d 894, 898 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (ability of an entity that is not a party to a contract or a third-party beneficiary of the contract to sue "goes to the merits and does not deprive courts of jurisdiction"); *James M. Clifton, I, Inc. v. Premillenium Ltd.*, No. 05-08-01528-CV, 2010 WL 2089655, at *2 (Tex. App.—Dallas May 26,2010, no pet.) (mem. op.) (question of capacity does not affect the jurisdiction of the court; it involves a question concerning the merits of the claims).

Unlike jurisdiction, the assertion of a lack of capacity is procedural, and can be waived.[19] Specifically, rule 93 requires that a pleading asserting a challenge to capacity be verified by affidavit.[20] A party who fails to follow this requirement waives the right to complain about the matter on appeal. *See John C. Flood of D.C., Inc. v. Supermedia, LLC*, 408 S.W.3d 645, 653 (Tex. App.— Dallas 2013, pet. denied).

UBS's fourth amended answer, the live pleading at the time of trial, does not challenge Highland's capacity to assert its breach of contract claim.[21] But Highland did not challenge the absence of a verified pleading raising the issue of capacity. An issue subject to pleading requirements, such as the issue of capacity, may be tried by consent.[22]

There is no question that the issue of whether Highland LP had the right to assert a breach of contract claim was raised and tried in the court below. The issue first arose with the addition of Highland Ltd. as a party in the second amended petition. This triggered considerable argument and confusion about which Highland entity purported to own the trade. UBS sought discovery on the relationship between Highland LP and Highland Ltd., and the parties agreed that Highland would designate a corporate representative to testify concerning this topic, as well as on the financial condition of both Highland entities during the relevant time frame. Ultimately, Highland's representative, Jason Post, testified that Highland LP held the KIK Trade and was the correct counterparty.

---

[19] *See Nootsie,* 925 S.W.2d at 661

[20] *See* TEX. R. CIV. P. 93.

[21] Although the second amended answer asserted that "Highland Credit Opportunities CDO, L.P. was not a party to the transaction at issue" and averred that **UBS** was not liable in the capacity in which it had been sued (emphasis added), these defenses were abandoned in the subsequent answers that superseded the second amended answer. *See* TEX. R. CIV. P. 65.

[22] *See 1 Lincoln Fin. Co. v. Am. Family Life Ass. Co.,* No. 02-12-00516-CV, 2014 WL 4938001, at * 3 (Tex. App.—Fort Worth Oct. 2, 2014, no pet. h.) (mem. op.).

The parties' positions as to which Highland entity owned the trade were fluid throughout the litigation. For example, in contrast to its argument on appeal, in one motion, UBS stated that Highland LP is "the entity that owned and had the obligations to close on the KIK Trade." In response to that motion, Highland asserted that Highland Ltd. "is the entity that was contractually obligated to make a payment to Defendants." In his trial testimony, Chism aptly described the situation when he observed, "there is a lot of confusion in this case."

In pre-trial correspondence to the trial court, UBS requested that Highland Ltd. be dismissed from the lawsuit. UBS noted that if the Ltd. entity was not dismissed, "then the issue of the proper party is one for which plaintiffs bear the ultimate burden of proof, and UBS is entitled to present evidence at trial on this issue."

Five days prior to trial, the parties entered into a Rule 11 agreement acknowledging that "the proper party plaintiff is an issue to be decided in this case." The parties agreed not to impeach witnesses on the subject of whether Highland LP or Highland Ltd. was the proper party to the KIK Trade, "with the express understanding that the parties are still litigating which Highland Capital entity is the proper contracting party."

The argument continued at trial, centering on whether Highland LP was entitled to enforce the claim because the revised trade confirmation constituted an oral assignment. The trial court did not make any express findings on the issue, but the findings of fact and conclusions of law reference the Ltd.'s nonsuit and refer to the contract claim "of Highland LP." Under these unique circumstances, where capacity was clearly litigated, albeit mischaracterized as standing, we are reluctant to conclude that the issue has not been preserved for our review.

On this record, we cannot conclude that Highland LP lacked capacity to assert the breach of contract claim. The revised trade confirmation reflects that Highland LP is the counterparty to the trade. Testimony at trial explained that the trade was moved within Highland

from one investment fund, Highland Ltd. to another investment fund, Highland LP. Chism, the Highland closer responsible for the trade testified that it is not unusual to reallocate a trade, and reallocation occurs at the discretion of the buyer. The reallocation of a trade does not change the trade date, so in this instance, the trade date of March 27, 2008 did not change. The terms of the trade also remained unchanged. As Chism explained, when a trade is reallocated, it is considered the same trade, and the reallocation "usually doesn't matter to the counter-party." The time and closing calculations are still measured from the original trade date, and the terms and conditions remain the same. Here, UBS signed and returned the revised trade confirmation for the KIK Trade listing Highland LP as the new buyer, which signified to Chism that UBS agreed to the reallocation.

The record reflects that for at least a year after the revised trade confirmation, the parties continued to engage in discussion about closing the trade. UBS did not object to the reallocation, and by signing the revised trade confirmation, consented to the reallocation. Indeed, the trade was treated as though nothing had changed, and there was never any indication from UBS that the Highland internal reallocation in any way impacted the transaction. In fact, in April 2009, UBS sent execution documents to Highland that specified Highland LP as the counterparty. From the time of the reallocation through the time in 2009 when the parties ceased communication about the trade, there was never any discussion about whether Highland LP was the correct party.

UBS now insists that the lack of a written assignment is fatal to the establishment of Highland LP's entitlement to bring the claim. In support of its argument, UBS relies on authority providing that the assignment of a claim or cause of action must be in writing.[23] But the present

---

[23] *See Mallios v. Baker*, 11 S.W.3d 157, 171–72 (Tex. 2000) (discussing statutory provision requiring written assignment of interest in judgment or cause of action).

case does not involve the assignment of an interest in a judgment or cause of action. Instead, this case involves the internal transfer of ownership of the KIK Trade. At the time of the reallocation, there was no judgment or cause of action to transfer because the reallocation occurred two years before the lawsuit was filed.

Moreover, the revised trade confirmation is in writing. While the revised trade confirmation lacks conventional, formal language of assignment and transfer, it names Highland LP as the new owner of the KIK Trade and affords the LP entity all of the rights and responsibilities of the original confirmation. There is nothing to suggest that Highland Ltd. retained any rights in the trade after the reallocation to Highland LP. In essence, under the revised trade confirmation, Highland LP stepped into the shoes of Highland Ltd. and assumed all of its rights.[24]

But we need not, and do not, conclude that an internal reallocation necessarily constitutes an assignment. Here, regardless of characterization, the revised trade confirmation functioned like an assignment, was treated by all parties without objection as an assignment, and was sufficient to transfer ownership of the trade to the LP such that Highland LP has the capacity to assert a breach of contract claim.[25]

### Breach of Contract.

In its first and second issues, Highland asserts the trial court erred in concluding that time was not of the essence and UBS did not commit a material breach of the Contract. To this end, Highland challenges the trial court's findings numbered 9, 10, and 11. In findings number nine and ten, the trial court found that "evidence supporting [Highland's] breach of contract claim is

---

[24] *See Vandeventer v. All American Life & Cas. Co*., 101 S.W.3d 703,715 (Tex. App. —Fort Worth 2003, no pet.) (discussing characteristics of assignment).

[25] The result would be the same under New York law. *See UBS AG v. Highland Capital Management L.P*., No. 650094/2010, 2010 WL 4941995, at *2 (N.Y. Sup., Dec. 1, 2010) (not designated for publication) (concluding Highland Credit sole buyer under the contract where loan reallocated from Highland Capital to Highland Credit and UBS revised trade confirmation to reflect the reallocation).

not persuasive," and "the court is not convinced by a preponderance of the credible evidence that UBS breached . . . ." The court further found that:

> [Highland] failed to prove the parties agreed that time was of the essence during the first sixty days after the Trade Date, that [Highland] ever complained of delay by [UBS] during that period, or that any delay attributable to [UBS] during that period was material.

(finding number 11). The findings of fact entered in this case "are of the same force and dignity as a jury's answers to jury questions."[26] We review the findings of fact by the same standards that are applied in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a jury question.[27]

We review de novo a trial court's conclusions of law to determine if the trial court drew the correct legal conclusions from the facts.[28] We are not bound by the trial court's legal conclusions, but the conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence; incorrect conclusions of law will not require reversal if the controlling findings of fact will support a correct legal theory.[29]

Highland's breach of contract claim is premised on the language in the Standard Terms which suggests that trades be settled "as soon as practicable after the Trade Date." Despite the fact that the trade was delayed by one party or the other from its inception through 2009, Highland's claim is narrowly focused on the three months following execution of the trade confirmation. According to Highland, UBS's failure to settle the trade within the first three months after the trade date was not "as soon as practicable" and therefore constitutes a breach of

[26] *Lambright v. Trahan*, 322 S.W.3d 424, 430 (Tex. App.—Texarkana 2010, pet. denied) (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)).

[27] *Id.* (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996)).

[28] *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

[29] *Id.*; *see also May v. Buck*, 375 S.W.3d 568, 573 (Tex. App.—Dallas 2012, no pet.).

contract. Highland also contends the parties agreed time was of the essence. Thus, only the time period from March 27, 2008 to June 20, 2008 is material to our determination. June 20, 2008 was T+60, which according to Highland, was the deadline for settling the trade.

The Contract provides that it is governed by New York law, and the parties agree that New York law applies to the breach of contract determination. Under New York law, the elements of a cause of action for breach of contract are: (1) the existence of a contract, (2) plaintiff's performance under the contract, (3) defendant's breach under the contract, and (4) resulting damages.[30] Typically, a contract is not breached until the time for performance has expired.[31] We therefore begin our inquiry by examining whether the Contract specified a time for performance.

### *Does Goldman Set the Standard for Determining Time for Performance?*

Highland relies almost entirely on a New York trial court opinion in a summary judgment case to suggest that the failure to settle the KIK Trade within three months after the trade date constitutes a breach of contract.[32] According to Highland, *Goldman* is "controlling" and by failing to apply it to the instant case, the trial court "misapplied the governing law of New York." We disagree.

The *Goldman* facts are distinguishable from the instant case. In *Goldman*, $140 million in distressed debt of Delphi Corporation was being sold in bankruptcy. The Delphi plan of reorganization required that any assignments of the debt be effectuated by September 10, 2009 (the "Record Date"). Between July 15 and July 30 of that year, Goldman and High River entered into several Delphi debt trades. The trades were memorialized in LSTA standard form trade

---

[30] *Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 921 N.Y.S.2d 237, 239 (App. Div. 2d Dept. 2011); *J.P. Morgan Chase v. J.H. Electric*, 893 N.Y.S. 2d 237, 239 (App. Div. 2d Dept. 2010).

[31] *Rachmani Corp. v. 9E 96th St. Apt. Corp.*,629 N.Y.S. 2d 382, 384 (App. Div. 1st Dept. 1995).

[32] *See Goldman Sachs Lending Partners, LLC v. High River Limited Partnership*, No. 603118/09, 2011 WL 6989894, at *9 (Sup. Ct. N.Y. Cty., Dec. 22, 2011).

confirmations that incorporated the Standard Terms.[33] Goldman then entered into downstream trades to sell the portions of Delphi debt that it expected to receive from High River.[34]

On August 25, 2009, a memorandum advised market participants that all pending assignments had to be submitted to the administrative agent no later than September 4. Concerned that it would miss the deadline, Goldman began pursuing settlement of the trades with High River more aggressively.[35] Numerous calls were made to High River and its counsel, but these calls were either unreturned or met with equivocation. Several additional written communications were sent to High River, but there was no response.[36]

On September 3, 2009, High River advised Goldman that it would be unable to close the trades on September 4. Thus, the trades were not closed by the Record Date. *Id*. In order to meet its obligations to downstream purchasers, Goldman had to purchase Delphi debt on the market at a price higher than the price it had agreed to pay High River. *Id*. As a result, Goldman sued High River for breach of contract.[37]

During discovery, it was revealed that High River had been unable to close because it was "short" on the debt. The evidence also showed that High River was also unable to close because it was not in a position to deliver the documentation necessary to close the trades by assignment.[38] High River did not dispute the evidence demonstrating that it had been feasible to close the trades and that the final deadline for settlement of assignments was September 10.

---

[33] *Id*. at *3.

[34] *Id*. at *5.

[35] *Id*. at *4.

[36] *Id*.

[37] *Id*. at *1.

[38] *Id*. at *4.

Accordingly, the trial court granted Goldman's motion for summary judgment.[39] In reaching its conclusion, the trial court observed that High River never made any attempt to acquire the Delphi debt, ignored virtually all of Goldman's communications, and consistently delayed closing. In addition, High River entered into the trade confirmations when it was short and unable to deliver the necessary documentation to the administrative agent.[40]

The court found that the phrase in the Standard Terms "as soon as practicable after the Trade Date" is unambiguous, and its meaning is synonymous with "as soon as possible."[41] The court then observed that:

> Using the word 'practicable' in the context of the factual scenario underlying the establishment of the Record Date for completing assignments . . . it is clear that under the plain meaning of the Trade Confirmations, settlement of the Trades by the Record Date was essential.[42]

Highland couples the fact that the *Goldman* trades were not settled within T+30 with the *Goldman* court's conclusion that the trades were not settled "as soon as practicable," to urge that a trade that fails to settle in twice the T+30 timeframe could not possibly meet the as "soon as practicable" standard. This argument, however, ignores the context of the *Goldman* decision that renders it inapplicable to this case.

The *Goldman* court did not consider the number of days the trade had been delayed in a vacuum. Instead, the court focused on the Record Date, a deadline outside the Standard Terms and unique to that case, to conclude that the trades had not been timely settled. The Record Date was of particular significance because after that time, the debt could not be assigned.[43]

---

[39] *Id*. at *9.

[40] *Id*. at *7–9.

[41] *Id*. at *6.

[42] *Id*.

[43] *Id*.

There was no similarly urgent outside deadline in the case at bar. There is also no evidence that Highland expeditiously or aggressively sought to close the KIK Trade between March and June 2008. Indeed, by Highland's own admission, it was not ready to settle the KIK Trade until May 8, 2008 because its counsel was reviewing the Closing Documents.

There is no dispute that the Standard Terms' T+20 suggested time frame for settlement of distressed debt trades is just that—a suggestion. Allison Taylor, former executive director of LSTA and Highland's expert testified that the guidelines are not a strict rule, but "more of a suggestion." Taylor agreed that it is impossible to set absolute deadlines with respect to the obligations of the parties to a trade. Similarly, Chism, testifying for Highland, agreed that the LSTA merely provides "target dates, deadlines." Unlike *Goldman*, this case does not involve a definitive deadline. Therefore, *Goldman* does not control our determination of the time for performance.

### *Does the Industry Average Define the Deadline?*

Highland contends that the phrase "as soon as practicable after the Trade Date" requires that trades be settled within T+60 because T+60 is the industry average. Therefore, Highland posits that any delay beyond T+60 is unreasonable and not "as soon as practicable." In support of its assertion, Highland relies on Taylor's testimony concerning an LSTA study showing that eighty percent of trades in the second quarter of 2008 settled within T+60. Taylor acknowledged, however, that there is a still a problem in the industry concerning a standard settlement period. Taylor also testified that she spent her career trying to make the market more efficient, and she is "very interested in making sure the results of this case are good for the market."

The UBS attorney that worked on settlement of the KIK Trade also testified that the standard practice for closing a trade during the applicable time period was thirty to sixty days.

But she also noted that it could take a lot longer, and the thirty to sixty days "was just kind of an average." Jeff Teach, a UBS trader, testified:

> Well, the average time to close [a] distressed trade has been 50-60 days in that area. The recommended closing period is 20 days, so clearly the industry is closing much longer than what this recommended period is. But as long as counter-parties are working towards a closing, then I think that fits your description of best efforts, a reasonable standard, et. cetera.

UBS's expert, Stanley Fortgang, testified that "as soon as practicable" means "as soon as possible, as soon as the parties are capable of closing the transaction." Fortgang also stated that three or four months was the norm, with four months being the longer end of the norm. Fortgang also opined that there had been no unreasonable delay by UBS on the KIK Trade up to May 29, 2008.

Highland's effort to impose an absolute requirement to settle within T+60 based on an industry average for a single quarter of one year is misplaced. An average, by definition, would involve some trades with lower settlement times and some trades with higher settlement times. The absence of an absolute, definitive deadline is supported by the testimony and is evident in the phrase "as soon as practicable." We view this language as a tacit recognition of the dynamics of the market and the reality that practicability is relative to the specific circumstances of a trade. The industry average does not define the time for performance.

### *Was This a Time of the Essence Contract?*

Highland also seeks to equate the phrase "as soon as practicable" with the imposition of a "time of the essence" requirement in the Contract. But there is no evidence the parties agreed that time was of the essence in this transaction.

The vast majority of New York cases pertaining to a time of the essence contract involve equitable actions for specific performance in a real estate contract.[44] In this context, the courts have noted that "the mere fixing of a time for performance does not result in the making of a time of the essence contract."[45] In a real estate contract, "a party need not state specifically that time is of the essence, as long as the notice specifies a time on which to close and warns that failure to close on that date will result in default."[46]

Highland insists that time is also of the essence "as a matter of law" when a contract involves an asset that fluctuates in value. Although both parties cite to *Lusker v. Tanner* [47] to advance their argument, *Lusker* does not inform our analysis. In *Lusker*, the plaintiff sued for specific performance. The court noted that this was significant because specific performance is a remedy in equity, not law.[48] In this regard, the court stated, "The distinction is significant since the rule of equity is that time of performance will not be considered the essence of a contract unless it affirmatively appears that the parties regarded it as a material consideration."[49] The court further observed:

> The mere insertion in the contract of a day of its completion does not make such time the essence of the contract, and it will not be implied as essential except when the subject of the sale has a fluctuating value, or where the object of the contract is a commercial enterprise, or the delay in completion would involve one of the parties in a serious loss.[50]

---

[44] *See e.g., Brum Realty Inc. v. Takeda,* 613 N.Y.S. 2d 372, 373 (App. Div. 1st Dept. 1994); *ADC Orange, Inc. v. Coyote Acres*, *Inc.*, 857 N.E.2d 513, 516 (N.Y. 2006).

[45] *ADC*, 857 N.E.2d at 516.

[46] *Westreich v. Bosler*, 965 N.Y.S. 2d 467, 467 (App. Div. 1st Dept. 2013).

[47] 456 N.Y.S. 2d 354, 357 (App. Div. 1st Dept. 1982)

[48] *Id.*

[49] *Id.*

[50] *Id.*

The instant case does not involve equitable remedies, but rather a request for damages resulting from an alleged breach of contract. And even if we were inclined to apply the "fluctuating value" language from *Lusker* and similar cases, a critical component is missing. In *Lusker*, as in the cases involving the sale of real estate, the contract at issue involved a specified date for performance or completion.[51] No such date was present here. Instead, the contract stated that the trade should occur "as soon as practicable after the Trade Date." This does not equate to an agreement that time was of the essence.

In addition, neither party appears to have regarded the trade as one in which time was of the essence in the first sixty days after the trade date. There is no evidence of Highland expressing any urgency to settle. And notwithstanding Highland's focus on the first sixty days after the trade, the parties continued to discuss settlement for over a year beyond the June 20, 2008 deadline Highland seeks to impose. In fact, Highland notified UBS on October 19, 2009 that Highland was "now ready to settle this trade." It is undisputed that the value of the debt fluctuated on a daily basis. But Highland does not demonstrate the significance, if any, of these fluctuations during the first sixty days after the trade date. More important, Highland also does not demonstrate that the parties agreed that closing was essential within T+60 to mitigate the impact of for such fluctuations.

A court may not write into a contract conditions the parties did not insert or add or excise terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning.[52] "When parties set down their agreement in a clear, complete document, their writing as a rule should be enforced according to its terms."[53] We

---

[51] *Id.* at 122; *see also Westreich*, 965 N.Y.S. 2d at 467.

[52] *See Bokor v. Markal*, 960 N.Y.S. 2d 202, 203 (App. Div. 2d Dept. 2013).

[53] *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 162 (N.Y. 1990).

therefore decline Highland's invitation to impose deadlines or conditions in the Contract that do not exist.

### Did UBS Delay Constitute a Breach?

Having determined that the parties did not agree that time was of the essence and T+60 was not an absolute deadline for closing, we must now decide whether the circumstances of this particular trade were such that UBS's failure to settle the KIK Trade within the first three months was a breach of its contractual obligation to settle "as soon as practicable."[54] To this end, Highland identifies three alleged instances of delay by UBS—the Upstream Trade, delay in notifying Highland of the Upstream Trade, and a delay in pricing.

As to the first alleged delay, Highland seeks to characterize the UBS Upstream Trade as a short sale, and argues that the KIK Trade was not timely closed because UBS did not own the debt it was trading. Highland also complains that UBS did not disclose that the KIK Trade was a short sale.

Teach testified that a short sale occurs when a trader conducts a trade "with no corresponding buy." Highland's expert testified that when a party buys debt from an upstream seller, that party may not own it as a matter of record, but he owns it as a matter of risk. In other words, the buyer of an upstream trade owns the debt, but "just needs to close on it." Teach also testified that it is market convention that once a party has executed a trade, the party is deemed to own the risk.

Taylor further testified that it is not unusual for a party to have an unsettled upstream trade. To the contrary, it is common. Chism confirmed that Highland engages in upstream trades "all the time." UBS's attorney testified that "probably most of" the trades she worked on in 2008

---

[54] *See Savista v. 470 Newport Assoc.*, 623 N.E.2d 1171,1172 (N.Y. 1993) (stating where contract does not specify time for performance, performance must be made in reasonable time); *Young v. Whitney*, 490 N.Y.S. 2d 330, 331 (App. Div. 3rd Dept. 1985) (noting "reasonable time" for performance depends upon subject of contract, what parties contemplated at the time they entered contract, and the circumstances surrounding performance).

were delayed to some extent by the closing of an upstream trade. The Upstream Trade was executed the day before the KIK Trade. Therefore, as Teach and Fortgang both explained, the KIK Trade was not regarded as a short sale in this market.

In addition, the record reflects that UBS informed Highland that the Upstream Trade was pending on April 10, 2008, and again on April 28, 2008. Highland acknowledged the pendency of the Upstream Trade, and on May 8 requested the upstream documentation.

Highland also complains that UBS failed to send the necessary pricing for the KIK Trade until June 24, 2008.[55] Highland is not clear as to whether its complaint pertains to preliminary or final pricing. However, when counsel for UBS sent pricing information on June 24, the date about which Highland complains, she indicated that pricing would be finalized for the closing. It is undisputed that a trade cannot close without final pricing. Counsel for UBS testified that pricing is a function of the date of settlement. Likewise, Chism agreed that before there can be final pricing, there must be a final closing date. Nonetheless, Chism could not identify any time within the three month period that he received approval to settle the KIK Trade, and there is no evidence that Highland provided UBS with a final closing date during this time. There is also no evidence that Highland ever complained about any delay in its receipt of the June 24 pricing information or about the lack of final pricing at any time thereafter.

Highland was not prepared to settle the KIK Trade until May 8, 2008, and the Upstream Trade settled on May 15. The evidence clearly demonstrates that Highland had knowledge of the Upstream Trade. The Closing Documents and the documentation concerning the Upstream Trade were provided to Highland on May 29. The Standard Terms provide that a trade is subject to negotiation, execution, and delivery of acceptable contracts and instruments of transfer, and the User's Guide states that the recommended dates for the transmission of documents by the seller

---

[55] In trade timing, this occurred at T+64.

are not definitive. Therefore, the contract clearly affords some flexibility in the preparation and delivery of documentation, the timing of which appears to depend upon the unique circumstances of each trade. Moreover, Highland's closer was never given the authority to close, so there was no closing date to trigger the preparation of final pricing.

On these facts, there is nothing to support Highland's contention that the Upstream Trade or the lack of pricing resulted in such unreasonable delay that UBS breached the contract by failing to close the KIK Trade "as soon as practicable." Therefore, we conclude the trial court did not err in determining that Highland failed to prove UBS committed a material breach of the Contract.[56] Highland's first and second issues are overruled. The trial court's judgment is affirmed.

121200F.P05

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE

---

[56] Our resolution of these issues obviates the need to consider Highland's remaining issues. *See* TEX. R. APP. P. 47.1.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

HIGHLAND CREDIT OPPORTUNITIES
CDO, L.P., Appellant

No. 05-12-01200-CV     V.

UBS AG, Appellee

On Appeal from the 192nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 10-16004.
Opinion delivered by Justice FitzGerald.
Justices Fillmore and Stoddart participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellee UBS AG recover its costs of this appeal from appellant
HIGHLAND CREDIT OPPORTUNITIES CDO, L.P..

Judgment entered November 14, 2014.