**REVERSE and RENDER and Opinion Filed July 30, 2021**



In The
# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-19-00440-CV

**OBSIDIAN SOLUTIONS, LLC F/N/A ARCO IDEAS, LLC, Appellant**
**V.**
**KBIDC INVESTMENTS, LLC, Appellee**

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-10092**

## MEMORANDUM OPINION

Before Justices Pedersen, III, and Reichek[1]
Opinion by Justice Reichek

In this business dispute, KBIDC Investments, LLC sued Obsidian Solutions, LLC f/n/a ARCO Ideas, LLC for breach of contract, fraud, unjust enrichment, and money had and received in connection with agreements to develop and bring conceptual consumer products to market and to design an office facility. KBIDC purportedly purchased these causes of action out of bankruptcy from a company

---

[1] The Honorable Bill Whitehill was on the panel and participated at the submission of this case. Due to the expiration of his term on December 31, 2020, he did not participate in the issuance of this opinion. *See* TEX. R. APP. P. 41.1(a), (b).

called Blue Matrix, LLC. Following a jury trial, the trial court rendered a judgment favorable to KBIDC. Both sides appealed.

Among its issues on appeal, Obsidian challenges the trial court's subject matter jurisdiction over the lawsuit. For the reasons set out below, we conclude that, although the trial court had jurisdiction over the lawsuit, KBIDC lacked capacity to sue or recover on the claims it asserted against Obsidian. Accordingly, we reverse the trial court's judgment and render judgment that KBIDC take nothing.

## FACTUAL BACKGROUND

Kendall Harter, an entrepreneur and inventor, founded Blue Matrix, LLC and Hydro Toys, LLC (collectively, "Blue Matrix") in 2012 and engaged ARCO Ideas to assist in developing his ideas for an automatic sandwich-making machine, self-sealing water balloons, and water balloon-launching toys. Harter required ARCO to sign a mutual non-disclosure agreement to protect any proprietary information related to the products. The agreement prohibited ARCO from disclosing confidential information to third parties and required Obsidian to limit internal disclosure of information to only those employees to whom it was necessary to disclose information. Once those projects began, Harter also engaged ARCO to design its new offices.

Two years later, in May 2014, Blue Matrix was running out of money and terminated the relationship. By that time, ARCO had produced a self-sealing water balloon, which won Best in Show at Toy Fair 2015, but was not able to develop

either a water balloon "bazooka" or a working sandwich machine prototype. As for the office design/buildout, Harter said the finished product was riddled with problems. Harter testified that ARCO had failed to develop working products on time or within budget despite continually representing it was "on target." But Scott Goodwin of ARCO testified ARCO was hired to "assist" Harter in developing his ideas, and he detailed the work ARCO put into the projects. He said he never made any guarantees to Harter nor could he in a business in which "[s]omething has never been done before." As for the office space, Goodwin believed Harter put too much money into it by selecting high-rent space. He acknowledged there were issues with some of the vendors and products relating to the build out, but he said these were corrected.

In December 2015, Blue Matrix filed for chapter 11 bankruptcy. During the bankruptcy, Blue Matrix executed an Asset Purchase Agreement (APA) conveying certain assets to appellee KBIDC, a company created by Blue Matrix's largest investor, Jeff Kent, to buy the assets. After making the purchase, Kent said he wanted to determine why Blue Matrix went bankrupt and had a forensic accounting performed. Kent believed that despite the fact that Blue Matrix paid ARCO a substantial amount of money, ARCO had not fulfilled its contractual obligations, but had instead produced "worthless trash." KBIDC ultimately sued ARCO, now known as Obsidian, alleging claims for breach of the development agreements,

breach of the agreement to build out an office interior, breach of the nondisclosure agreement, fraud, unjust enrichment, and money had and received.

In its answer, Obsidian generally denied the claims and also raised several affirmative defenses, including that KBIDC was not a proper party because there had been no assignment of the claims and that the bankruptcy court had exclusive jurisdiction over the claims.

The case was tried to a jury. At the conclusion of the evidence, Obsidian sought a directed verdict on all claims on the basis that (1) KBIDC had no standing because it failed to list the causes of action on the bankruptcy schedules and (2) there was no evidence that the causes of actions were assigned to KBIDC. KBIDC alternatively argued there was no evidence that Obsidian breached any agreement. The trial court directed a verdict on KBIDC's fraud and money had and received claims in Obsidian's favor, but submitted questions on the contract claims and unjust enrichment claims.

The jury failed to find in KBIDC's favor on breach of contract, found Obsidian breached the nondisclosure agreement but awarded no damages, and awarded damages for unjust enrichment. The trial court rendered judgment in accordance with the jury's verdict and also awarded injunctive relief and attorneys' fees to KBIDC. The parties' post-judgment motions were denied by operation of law, and both sides appealed.

In five issues, Obsidian contends the trial court lacked subject matter jurisdiction over KBIDC's claims, misapplied the law regarding unjust enrichment, and erred in awarding attorney's fees and injunctive relief. In two issues by cross-appeal, KBIDC conditionally challenges the trial court's directed verdict on its claims for fraud, money had and received, and exemplary damages. It also challenges the jury's failure to find breach of contract and the jury finding of zero damages for breach of the NDA.

We begin our review with Obsidian's assertion that the trial court lacked jurisdiction over the claims.

## ANALYSIS

In its third issue, Obsidian argues the trial did not have subject matter jurisdiction over any of the causes of action asserted by KBIDC because (1) KBIDC did not acquire the contract claims or related causes of action under the APA and therefore had no standing to assert them and (2) the claims remain within the exclusive jurisdiction of the bankruptcy estate because they were not disclosed on Blue Matrix's bankruptcy schedules.

Subject matter jurisdiction is essential to a court's authority to decide a case. *Tex. Ass'n of Business v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). Standing is implicit in the concept of subject matter jurisdiction. *Id.* If a plaintiff lacks standing to assert a claim, the court has no jurisdiction over that claim and must dismiss it. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012).

–5–

Whether a party has standing to pursue a cause of action is a question of law subject to de novo review. *Id.* at 149–50. Because standing is jurisdictional, it cannot be waived and may be raised for the first time on appeal by the parties or the court. *Tex. Ass'n of Bus.*, 440 S.W.2d at 445–46. Moreover, if necessary, we may consider any submitted documents that are outside the record for the limited purpose of determining our own jurisdiction. *Greystar, LLC v. Adams*, 426 S.W. 861, 865 (Tex. App.—Dallas 2014, no pet.).

The record here shows that one month before trial, Obsidian filed a plea to the jurisdiction with evidence raising the same complaints as brought here. The plea, however, was never set for hearing and was not ruled on by the trial judge. During trial, however, both sides presented the issue as to whether the claims were assigned to KBIDC under the APA, and the trial judge ruled the claims were assigned. With that background in mind, we turn to Obsidian's jurisdictional arguments.

## A. Bankruptcy Court Jurisdiction

We begin with Obsidian's argument that the trial court lacked subject matter jurisdiction because the claims at issue were not disclosed on Blue Matrix's bankruptcy schedule and, therefore, remain within the exclusive jurisdiction of the bankruptcy court. Obsidian argues that until the claims are abandoned by the bankruptcy trustee or administered in the bankruptcy case, they remain the property of the bankruptcy estate even if the bankruptcy case has been closed or a plan was confirmed. *See Dixon v. First Family Fin. Servs.*, 276 B.R. 173, 181 (S.D. Miss.

2002), *abrogated on other grounds, Reed v. Miss. Farm Bureau Mut. Co.*, 299 B.R. 804 (S.D. Miss. 2003). Where, as here, the property was not disclosed, Obsidian contends the claims cannot have been either abandoned or administered. *Id*.

Bankruptcy can affect a debtor's standing to sue. *Norris v. Brookshire Grocery Co.*, 362 S.W.3d 226, 231 (Tex. App.—Dallas 2012, pet. denied). And while we agree that claims can, in some cases, remain the property of the bankruptcy estate if not disclosed before the estate is fully administered, this is not the result where, as here, the bankruptcy court *dismisses* the case. *See id*. Under the Bankruptcy Code, a dismissal, unless otherwise ordered, "revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title." 11 U.S.C. § 349(b)(3). All of the property that was transferred from the debtor to the estate revests in the debtor regardless of whether the debtor disclosed it to the bankruptcy court. *See e.g., Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 485 (2d Cir. 2014) (explaining that section 349(b)(3) "makes no distinction between those [assets] that were listed in the debtor's schedule of assets and those [assets] that were not; what is revested in the immediately-pre-petition owner or owners is 'the property of the estate.'").

The language of section 349(b) is unqualified; it states simply that unless a court orders otherwise, the dismissal of a bankruptcy revests the estate's property in the entity in which the property was previously vested. *See* 11 U.S.C. 349(b); *see*

–7–

*Revell v. Morrison Supply Co., LLC*, 501 S.W.3d 255, 262–63 (Tex. App.—Fort Worth 2016, no pet.). Nothing in the section provides that revesting is subject to disclosure requirements. *Id*. at 263. Rather, the section protects the interests of creditors and the bankruptcy process by allowing a court, for cause, to alter the general rule of revesting upon dismissal on a case-by-case basis. *See* 11 U.S.C. 349(b); *Revell*, 501 S.W.3d at 263. "Thus, if a bankruptcy court finds that undisclosed assets, if in existence, could impact the decision to dismiss, or if the debtor is receiving a "functional equivalent of a discharge" through dismissal . . . or if other considerations exist impacting the fairness to debtors or creditors of the revesting of undisclosed assets, the court has the authority to fashion an appropriate remedy in its dismissal order." *Revell*, 501 S.W.3d at 263.

Here, we assume for purposes of this opinion that (1) the causes of action were not disclosed on the Blue Matrix bankruptcy schedules but were known to Blue Matrix at the time it filed its schedules and (2) the duty to disclose imposed on Blue Matrix was likewise imposed on KBIDC, as the purported assignee. The bankruptcy court, however, dismissed the case and, in doing so, specifically referenced section 349. Although the order made several other provisions, including that all prior orders remained in full force and effect and the bankruptcy court retained jurisdiction to enforce, interpret, and implement terms those orders, it made no provision regarding undisclosed assets. Under these circumstances, we conclude section 349(b) revested the property in Blue Matrix upon dismissal and, accordingly, the

assets are not within the exclusive jurisdiction of the bankruptcy court. *See id*. We therefore reject Obsidian's assertion that the trial court lack subject matter jurisdiction on this basis.

## B. Standing

We next address Obsidian's contention that KBIDC has no standing in this case because the contracts at issue, and the causes of action related to them, were not assigned to it under the Asset Purchase Agreement.

The concept of standing is frequently confused with the concept of capacity. *Highland Credit Opportunities CDO, L.P. v. UBS AG*, 451 S.W.3d 508, 515 (Tex. App.—Dallas 2014, no pet.). A person must have both standing to sue and capacity to sue. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005).

The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a "justiciable interest" in its outcome; in contrast, the issue of capacity "is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate." *Austin Nursing Ctr.*, 171 S.W.3d at 849. A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy. *Id*.; *Highland Credit Opportunities*, 451 S.W.3d at 515. And, as we have explained: "When the issue involves capacity arising from a contractual right, 'Texas law is clear, and this court has previously held numerous times, that a challenge to a party's

privity of contract is a challenge to capacity, not standing.'" *Highland Credit Opportunities*, 451 S.W.3d at 515; *see Pike v. Tex. EMC Mgmt., LLC,* 610 S.W.3d 763, 779 n.19 (Tex. 2020). Thus, while the question of whether a party is entitled to sue on a contract is often informally referred to as a question of standing, it is not truly a standing issue because it does not affect the jurisdiction of the court; it is instead, a decision on the merits. *Highland Credit*, 451 S.W.3d at 515; *Malouf v. Sterquell PSF Settlement, L.C.*, No. 05-17-01343-CV, 2019 WL 5799988, at *3 (Tex. App.—Dallas Nov. 7, 2019, pet. denied) (mem. op.). Unlike jurisdiction, the assertion of lack of capacity can be waived. *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996).

Here, Obsidian's complaint—that the APA did not assign or transfer to KBIDC the contracts and the causes of action related to them—is one of privity of contract. *See Subsequent Injury Fund, v. Serv. Lloyds Ins. Co.*, 961 S.W.2d 673, 677 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) ("Privity is generally defined as a mutual or successive relationship to the same rights in property."); *see also 6200 GP, LLC v. Multi Serv. Corp.*, No. 05-16-01492-CV, 2018 WL 3154594, at *3 (Tex. App.—Dallas June 28, 2018, no pet.) (mem. op.) ("Privity is established by proving the defendant was a party to an enforceable contract with either the plaintiff or someone who assigned the cause of action to the plaintiff."). As such, it is not a question of standing but whether KBIDC can recover in the capacity in which it sued, an issue that goes to the merits of KBIDC's claims. *See Highland Credit*, 451

S.W.3d at 516 (concluding that question of whether party could sue on contract because of lack of evidence of assignment was question of capacity, not standing); *Nat'l Health Res Corp. v. TBF Fin., LLC.*, 429 S.W.3d 125, 129 (Tex. App.—Dallas 2014, no pet.) (concluding whether plaintiff was assignee of lease was question of capacity, not standing); *Douglas-Peters v. Cho, Choe & Holen, P.C.*, No. 05-15-01538-CV, 2017 WL 836848, at *11–12 (Tex. App.—Dallas March 3, 2017 no pet.) (mem. op.) (addressing whether retainer agreement was assigned to plaintiff as capacity issue in breach of contract suit). The question, therefore, is whether KBIDC has capacity to sue and recover on its claims. Before addressing that issue, however, we must first determine whether that particular question is properly before us.

## C. Capacity

KBIDC argues Obsidian has waived any defense as to capacity by failing to timely raise it below. Specifically, KBIDC asserts that Obsidian did not file a verified pleading until four months after the pleading deadline and did not seek leave to amend; accordingly, they assert the issue of capacity is waived.

Texas Rule of Civil Procedure 93 provides that a pleading must be verified by affidavit if it alleges the plaintiff does not have the legal capacity to sue or is not entitled to recover in the capacity in which it sues. *See* Tex. R. Civ. P. 93. A party who fails to raise the issue of capacity through a verified pleading waives the issue on appeal. *Pledger v. Schoellkopf*, 762 S.W.2d 145, 146 (Tex. 1988) (per curiam). However, if a plaintiff does not challenge the absence of a verified pleading raising

the issue of capacity, the issue may be tried by consent. *Highland Credit*, 451 S.W.3d at 516. When issues not raised by the pleadings are tried by consent, they must be treated in all respects as if they had been raised by the pleadings. TEX. R. CIV. P. 67; *Compass Bank v. Nacim*, 459 S.W.3d 95, 113 (Tex. App.—El Paso 2015, no pet.). Trial by consent "applies only where it appears from the record that the issue was actually tried, although not pleaded." *Id.*

Here, Obsidian's verified pleading was filed after the deadline set by the trial court, but KBIDC did not move to strike. Moreover, at trial, the issue of whether KBIDC bought the assets out of bankruptcy and which assets were purchased arose during KBIDC's direct examination of Kent. After several questions, the trial court took a break, and, outside the jury's presence, KBIDC's counsel explained that he was asking the line of questions because Obsidian appeared to dispute whether KBIDC owned the claims. Obsidian's counsel then told the court he planned to argue that under the APA, which had been admitted into evidence, KBIDC had not purchased the "right . . . to the lawsuit." The trial court listened to arguments from both sides on their interpretations of the APA before finding that the APA gave "authority to the Plaintiff for . . . the advancement of this suit." Given the parties' arguments and the trial court's ruling, we conclude that capacity was tried by consent in the trial court. *See Highland Credit*, 451 S.W.3d at 516 ("[W]here capacity was clearly litigated, albeit mischaracterized as standing, we are reluctant to conclude that the issue has not been preserved for our review."); *Malouf*, 2019 WL 5799988,

–12–

at *4 (addressing capacity issue, brought as standing, when issue tried by consent). To the extent KBIDC argues the issue was waived by Obsidian's failure to specifically argue capacity on appeal, as opposed to standing, both *Highland Credit* and *Malouf* considered capacity under similar circumstances. *See Highland Credit*, 451 S.W.3d at 517; *Malouf,* 2019 WL 5799988, at *4. Accordingly, we consider whether KBIDC had capacity to bring or recover on these claims.

When a cause of action is assigned or transferred, the assignee becomes the real party in interest with the authority to prosecute the suit to judgment. *Douglas-Peters*, 2017 WL 836848, at *10. To recover on an assigned cause of action, an assignee must prove: (1) a cause of action existed; (2) the claim was capable of assignment; and (3) the cause was in fact assigned to the party seeking recovery. *See id.* Accordingly the assignee, being the real party in interest and in control of the lawsuit, is also in privity with the nominal party such that the judgment therein will bind him as a party. *Id.*

Here, Obsidian argues that, under the plain language of the APA, the contracts at issue here and the causes of action related to them were not assigned to KBIDC; thus, KBIDC is without privity of contract. Contract terms are given their plain, ordinary, and generally accepted meanings, and contracts are to be construed as a whole in an effort to harmonize and give effect to all provisions of the contract. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Our primary concern when interpreting a contract is to ascertain and give effect to the

intent of the parties as expressed in the contract. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 346 (Tex. 2006).

As relevant here, the APA is between KBIDC, as buyer, and Blue Matrix Labs, LLC, as seller. Article I is entitled "The Transaction" and sets out the purchase and sale of acquired assets and assumed liabilities. The relevant provisions provide as follows:

> 1.1. Purchase and Sale of Acquired Assets; Assumed Liabilities
>
> (a) Purchase and Sale of Acquired Assets. Subject to the terms and conditions hereof, at the Closing, [Blue Matrix] shall sell, convey, transfer, assign and deliver to [KBIDC], and [KBIDC] shall purchase from [Blue Matrix], all of such [Blue Matrix's] right, title and interest in and to all of such Seller's property and assets, real, personal or mixed, tangible or intangible, excluding only the Excluded Assets (the "Acquired Assets"), free and clear of all Encumbrances other than Permitted Encumbrances, including the following:
>
> > [A list of fifteen categories of assets]
>
> * * *
>
> (b) Excluded Assets. Notwithstanding anything herein to the contrary, from and after Closing, [Blue Matrix] shall retain all of [its] right, title and interest in and to, and there shall be excluded from the sale and conveyance, assignment or transfer to [KBIDC] hereunder, and the Acquired Assets shall not include, solely the following assets and properties (such retained assets and properties being the "Excluded Assets"):
>
> * * *
>
> > (ii) all Contracts not set forth on the Assumed Contracts Schedule or, if set forth on the Assumed Contracts Schedule, that [KBIDC] elects by written notice to [Blue Matrix] in accordance with Section 5.8 hereof to remove from the Assumed Contracts Schedule

(together with the Excluded Leases and the Rejected Contracts, the "Excluded Contracts");

Under section 12.6, the "Assumed Contracts Schedule" has the meaning ascribed in Section 1.1(a)(v), which defines the Assumed Contracts Schedule as the "Contracts listed on Schedule 1.1(a)(v)." The "Assumed Contracts" listed on Schedule 1.1(a)(v) are: (1) a sublease agreement with Kent Motorsports LP; (2) certain purchase orders from customers where delivery had not been made by the seller and payment had not been made by the customer; (3) Air Filled Balloons Deal Memorandum, dated January 15, 2015, by and between Hydro Toys and Funtastic Limited; and (4) Zorbz Licensing, Manufacturing and Distribution Deal Memorandum, dated as of January 15, 2015 (as amended).

Under the plain language of the contract, KBIDC obtained all of Blue Matrix's property and assets except for the Excluded Assets. These were the "Acquired Assets." The Excluded Assets included all contracts not set out on the Assumed Contracts Schedule. Thus, if a contract was not listed on the Assumed Contracts Schedule, Blue Matrix retained all right, title, and interest in and to it and the contract was not assigned or transferred to KBIDC. The contracts at issue in this case are not listed on the schedule; thus, they were not acquired by KBIDC.

KBIDC nevertheless asserts the APA assigned the contracts under two of the fifteen categories of assets listed in Section 1.1. Specifically, KBIDC contends the APA specifically assigned

(iv) all rights, remedies and benefits of [Blue Matrix] arising under or relating to any of the Acquired Assets . . . including rights, remedies and benefits arising out of express or implied warranties from manufacturers or suppliers of equipment or inventory purchased or ordered by [Blue Matrix] prior to the Closing Date . . . , and all claims and causes or action arising therefrom;

(viii) all goodwill, choses in action, causes of action, judgments, actions, claims and rights of any kind as against others (whether by contract or otherwise) relating to any of the Acquired Assets (including the assigned Intellectual Property) or Assumed Liabilities."

What KBIDC ignores, however, is that both categories are limited to either the "Acquired Assets" or the "Acquired Assets . . . or Assumed Liabilities." Under section 1.1(c), there are four broad categories of "Assumed Liabilities," which are limited to either the Assumed Contracts or the Acquired Assets, and those terms exclude any contract not listed on the Assumed Contracts Schedule.[2] KBIDC suggests the Assumed Contracts Schedule is limited to executory contracts and

---

[2] Section 1.1(c) provided as follows:

(c) <u>Assumed </u>Liabilities. Subject to the terms and conditions hereof, at the Closing, [KBIDC] shall assume and agree to fully pay, discharge, satisfy and perform, all of the following liabilities and obligations of [Blue Matrix] (the "<u>Assumed </u>Liabilities"):

    (i)      cure costs with respect to Assumed Contracts;

    (ii)      liabilities and obligations arising after the Closing Date relating to or arising out of the Assumed Contracts, but excluding, for the avoidance of doubt, any and all liabilities or obligations under any Assumed Contracts of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, whether or not existing on the Closing Date, arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or operation of the Acquired Assets or the conduct of any Seller's business prior to the Closing Date other than the Cure Costs;

    (iii)      liabilities and obligations arising after the Closing Date relating or arising out of the Acquired Assets, but excluding, for the avoidance of doubt, any and all liabilities and obligations of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, whether or not existing, or the use, ownership, possession or operation of the Acquired Assets or the conduct of any Seller's business prior to the Closing Date; and

    (iv)      accounts payable relating to the Acquired Assets arising in the ordinary course of business after the Closing Date.

unexpired leases, of which these contracts are neither. But nothing in the plain language of the contract, or its reading as a whole, supports that interpretation.

Considering the plain language of the APA and giving effect to all of its provisions, we conclude KBIDC was not assigned the ARCO contracts and therefore could not bring any claims based on or related to those contracts, including unjust enrichment (for which the jury awarded damages), money had and received, and fraud. Having failed to obtain an assignment of the claims, KBIDC lacked capacity to bring and recover on its lawsuit, and the trial court erred in finding otherwise. Given this determination, we need not address the remaining issues in this case.

We reverse the trial court's judgment and render judgment that KBIDC take nothing on its claims.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

190440F.P05

–17–



# Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

OBSIDIAN SOLUTIONS, LLC
F/N/A ARCO IDEAS, LLC,
Appellant

No. 05-19-00440-CV          V.

KBIDC INVESTMENTS, LLC,
Appellee

On Appeal from the 14th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-17-10092.
Opinion delivered by Justice
Reichek; Justices Pedersen, III
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that KBIDC Investments, LLC take nothing on its claims.

It is **ORDERED** that appellant OBSIDIAN SOLUTIONS, LLC F/N/A ARCO IDEAS, LLC recover its costs of this appeal from appellee KBIDC INVESTMENTS, LLC.

Judgment entered July 30, 2021.