**Opinion issued February 17, 2022**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-20-00828-CV

———————————

### IN RE DANI ROISMAN, Relator

---

### Original Proceeding on Petition for Writ of Mandamus

---

**\* \* \***

———————————

## NO. 01-21-00093-CV

———————————

### DANI ROISMAN, Appellant

### V.

### GAVRIELLA ETANA ROISMAN, Appellee

---

On Appeal from the 246th District Court
Harris County, Texas
Trial Court Case No. 2017-45578

This appeal and original proceeding arise from an enforcement action for medical child support filed by Gavriella Etana Roisman against her ex-husband, Dani Roisman. Gavriella sought to hold Dani in contempt for allegedly violating certain provisions of the couple's Agreed Final Decree of Divorce (Agreed Divorce Decree) by refusing to pay his share of health-care expenses Gavriella incurred for the in-patient psychiatric treatment of their daughter, Jane (a pseudonym), at two medical facilities, which were out-of-network providers under their health insurance plan. Gavriella also requested confirmation of the amount of the arrearages Dani owed her for the health-care expenses and a cumulative money judgment against Dani for the arrearages. In addition, Gavriella requested her attorney's fees.

Following a hearing, the trial court signed an enforcement order (1) holding Dani in contempt for failing to pay Gavriella medical child support, (2) confirming that Dani owed arrearages in the amount of $44,633.34 for medical child support, (3) rendering a cumulative money judgment against him in that amount, and (4) assessing $12,500 in attorney's fees against Dani, payable to Gavriella's attorney.

Dani has filed a mandamus petition in this Court, challenging the portion of the enforcement order holding him in contempt.[1] He also appeals the enforcement order, challenging the cumulative money judgment and attorney's fees award.

In the original proceeding (appellate cause no. 01-20-00828-CV), we conditionally grant the mandamus petition. In the appeal (appellate cause no. 01-21-00093-CV), we modify the cumulative money judgment for the medical child support arrearages to reflect the amount of $34,547.79 instead of $44,633.34, and we affirm the enforcement order as modified.

## Background

Dani and Gavriella have three children together. Jane is their oldest child. Dani and Gavriella divorced in February 2018 when Jane was 15 years old.

Dani and Gavriella signed an Agreed Divorce Decree in which they agreed to be joint managing conservators of the children with Gavriella having the right to designate the children's primary residence. As joint managing conservators, each parent had "the right, subject to the agreement of the other parent conservator, to consent to psychiatric and psychological treatment of the children." Dani and Gavriella also agreed that "in the event the parties do not reach mutual agreement on decisions regarding psychiatric treatment of [Jane] (other than in an emergency),

---

[1] The underlying case is *In the Interest of E.H.R., J.A.R., and S.H.R, Children*, cause number 2017–45578, in the 246th District Court of Harris County, Texas, the Honorable Angela Graves Harrington, presiding.

3

then the parties shall follow the recommendation of [Jane's] treating psychiatrist, Abigail Nodler, M.D."

The decree ordered Dani to pay child support to Gavriella and to provide medical insurance for the children. It also contained provisions setting out how the parties would split medical costs not paid by health insurance. The decree provided that "the reasonable and necessary health-care expenses" for medical, dental, and psychiatric costs for the children that are "not reimbursed by health insurance is allocated as follows: Gavriella Etana Roisman is ORDERED to pay 1/3 percent and Dani Roisman is ORDERED to pay 2/3 percent of the unreimbursed health-care expenses."

The decree also provided that the party incurring the health-care expense on behalf of a child was ordered to furnish forms, receipts, bills, and explanations of benefits reflecting the uninsured portion within 30 days after the incurring party received them. The non-incurring party was then required to pay, within 30 days of receipt, his or her percentage either by paying the provider directly or by reimbursing the incurring party for any advance payment exceeding that party's percentage. But, if the incurring party "fail[ed] to submit to the other party forms, receipts, bills, statements, and explanations of benefits reflecting the uninsured portion of the health-care expenses within thirty days after the incurring party receives them," then the non-incurring party was required to pay his or her percentage of the uninsured

4

portion "either by paying the health-care provider directly or by reimbursing the incurring party for any advance payment exceeding the incurring party's percentage of the uninsured portion of the health-care expenses within 120 days after the nonincurring party receives the forms, receipts, bills, statements, and/or explanations of benefits."

The Agreed Divorce Decree further provided:

Each party is ORDERED to use "preferred providers," or services within the health maintenance organization or preferred provider network, if applicable. Disallowance of the bill by a health insurance company shall not excuse the obligation of either party to make payment. Excepting emergency health-care expenses incurred on behalf of the children, if a party incurs health-care expenses for the children using "out-of-network" health-care providers or services, or fails to follow the health insurance company procedures or requirements, that party shall pay all (100%) of such health-care expenses incurred absent: (1) written agreement of the parties allocating such health-care expenses; or (2) further order of the Court.

On June 5, 2020, Gavriella filed a "Motion for Enforcement of Child Support Order," which she later amended. In her amended motion, Gavriella asserted that, as required by the provisions of the Agreed Divorce Decree, Dani failed to reimburse her for his 2/3 share of the uninsured portions of 10 bills for Jane's psychiatric treatment that Gavriella had paid. Gavriella alleged that, on January 7, 2020, she sent written demand to Dani requesting reimbursement of his 2/3 share of the 10 bills. Gavriella claimed that Dani was in contempt of court for violating the provisions of the decree that required him to pay her his share of the uninsured medical bills. She

5

alleged that each failure by Dani to reimburse her for the 10 medical bills constituted a separate violation of the decree. Gavriella's motion contained the following information regarding the alleged violations:[2]

| Violation | Date Paid By Petitioner | Health Care Provider | Net Amt. Movant Paid |
|---|---|---|---|
| 1. | 3-5-2019 | Menninger Clinic | $21,991.71 |
| 2. | 3-19-2019 | Visions Treatment Ctr. | $ 6,000.00 |
| 3. | 3-20-2019 | Menninger Clinic | $11,169.74 |
| 4. | 3-22-2019 | Visions Treatment Ctr. | $20,000.00 |
| 5. | 3-26-2019 | Carol Kiriakos, M.D. | $ 1,875.00 |
| 6. | 3-27-2019 | Visions Treatment Ctr. | $50,500.00 |
| 7. | 4-26-2019 | Carol Kiriakos, M.D | $ 786.85 |
| 8. | 5-22-2019 | Carol Kiriakos, M.D | $ 633.44 |
| 9. | 5-29-2019 | Visions Treatment Ctr. | $25,500.00 |
| 10. | 6-17-2019 | Visions Treatment Ctr. | $ 6,800.00 |
| | | SUB-TOTAL PAID = | $145,560.45 |
| | | Less Insurance (Visions) = | $ 60,221.73 |
| | | **TOTAL OUT-OF-POCKET =** | **$ 85,035.01** |

For each of the 10 violations, Gavriella asked that Dani "be held in contempt, jailed for up to 180 days, and fined up to $500.00, and that each period of confinement . . . run and be satisfied concurrently." She also asked that Dani "be placed on community supervision for ten (10) years on release from jail or

---

[2] Gavriella was the "petitioner" in the divorce proceeding, and she was the "movant" in the enforcement proceeding. Evidence at the enforcement hearing showed that Carol Kiriakos, M.D. was a pediatrician with Visions.

suspension of commitment." Gavriella claimed that Dani's "total arrearage at the time of [the] filing of this Amended Motion for Enforcement of Child Support Order is **$44,689.95** ($85,035.01 paid by [Gavriella] x 2/3, then reduced by a $12,000.00 credit for payments made by [Dani] since June 2019)." Gavriella asked the trial court to confirm the arrearages and render a money judgment in her favor for $44,689.95, plus interest. She also requested her attorney's fees and costs.

On September 29, 2020, the trial court conducted a hearing on Gavriella's amended motion for enforcement. Before presenting her evidence, Gavriella explained to the trial court that she understood Dani's position to be that he was not required to pay his 2/3 share of Jane's psychiatric bills because The Menninger Clinic and Visions Treatment Center were not "preferred providers" with his insurance plan, meaning they were out-of-network providers. Gavriella acknowledged that the Agreed Divorce Decree provided that "if a party incurs health-care expenses for the children using out-of-network health-care provider services, that party shall pay one hundred percent." But Gavriella pointed out that "emergency health-care expenses" are excepted from the requirement that the incurring party pay 100 percent of the out-of-network charges. Gavriella claimed that the charges for Jane's treatment at Menninger and Visions were emergency health-care expenses because they were for the treatment of a psychiatric emergency Jane that experienced in late February and early March 2019.

7

Gavriella also pointed out that she and Dani had agreed in the decree that Jane's psychiatrist, Dr. Nodler, would act as a "tiebreaker" if they could not agree on Jane's psychiatric treatment. Gavriella further cited the decree's provision requiring the parent incurring the health-care expense to furnish documentation—such as a bill, invoice, or explanation of benefit—reflecting the non-insured portion of the expense to the non-incurring parent within 30 days of receipt of the documentation. Once the documentation was received by the non-incurring parent, he or she had 30 days to pay his or her percentage of the non-insured portion. The non-incurring parent had 120 days to pay his or her percentage if the incurring parent did not forward the supporting documentation within 30 days of receiving it.

Dr. Nodler, Gavriella, and Dani testified at the enforcement hearing. Dr. Nodler testified first.

In conjunction with Dr. Nodler's testimony, Gavriella offered into evidence a "summary report" written by Dr. Nodler discussing Jane's psychiatric history. The report noted that Dr. Nodler first saw Jane in August 2017. Jane's psychologist, Dr. Crawford, had referred Jane to Dr. Nodler to determine whether Jane should be placed on medication for her anxiety and depression. Dr. Nodler's report stated that Jane had "established care" with Dr. Crawford in 2016 "due to debilitating depression and suicidal ideation."

After several office visits, Dr. Nodler determined that Jane met the criteria for major depressive disorder and generalized anxiety. She believed that Jane should continue with her therapy but also be prescribed antidepressant medication. Dr. Nodler placed Jane on medication and began therapy, but it "was not enough to help [Jane] start her recovery and healing process." In November 2017, Jane's ability to cope with the stress in her life had decreased, and she was engaging in self-injury by cutting herself with sharp objects.

At Dr. Nodler's recommendation, Jane was admitted for in-patient treatment at Menninger in November 2017 for a one-month stay.[3] Dr. Nodler's report reflected that Jane said that she had "a very positive experience at The Menninger Clinic." Jane was "discharged from Menninger Clinic in December of 2017 with a significant decrease in her symptom load." After the hospitalization, Jane had a remission of her symptoms and continued to improve for most of 2018. However, Dr. Nodler testified that, at the end of 2018, Jane began reengaging in "dangerous behaviors and started feeling less secure and less confident in her recovery."

During a family trip in December 2018, Jane overdosed on over-the-counter medication. Following the overdose, Jane was hospitalized at Houston Behavioral Hospital for five days. Dr. Nodler's testimony and her report indicated that, unlike

---

[3]     The Agreed Divorce Decree provides that Dani and Gavriella agreed to split 50/50 the cost of Jane's 2017 stay at Menninger.

her stay at Menninger Clinic, Jane's stay at Houston Behavioral Hospital was not "therapeutic" and that Jane "struggled to engage with the team and services there." Dr. Nodler's report explained, "Upon discharge from the acute inpatient care, [Jane] continued to decompensate mentally and emotionally."

Around late February to early March 2019, Dr. Nodler "strongly recommended a re-admission to the adolescent unit at Menninger for safety, stabilization, and longer term treatment." In her report, Dr. Nodler stated that she made the recommendation "[d]ue to [Jane's] acute distress layered upon her chronically elevated risk of self-harm and family psychiatric history." Dr. Nodler wrote that it was "an emergency situation requiring an immediate response." When asked at the enforcement hearing why she recommended placement at Menninger and why she considered it "an emergency situation," Dr. Nodler testified "[i]t was a combination of all of her acute, on-chronic risk factors for suicide, and that was coupled with impulsivity." Dr. Nodler also testified that Jane "on some level, recognized that she needed treatment and she needed help and she was willing to go to the Menninger Clinic." Dr. Nodler testified that Menninger Clinic "won't take any patient of any age who is not sort of, on some level, agreeing to go voluntarily. They don't commit people to Menninger." She stated that, because Jane was "willing to go" to Menninger, "it seemed like the safest and best option that was necessary."

Dr. Nodler testified that she was aware that Gavriella and Dani could not agree where Jane should receive psychiatric treatment. An email from Dr. Nodler, dated March 4, 2019, was admitted into evidence. In the email, she stated that she thought that "an admission to Menninger [was] the best option for [Jane's] acute care."

Dr. Nodler also told Gavriella and Dani that she wanted them "to consider a longer-term treatment program from Menninger such as a residential facility." At the enforcement hearing, Dr. Nodler explained that Menninger "will not keep teenagers" long term for "months at a time." And she had believed that "a longer-term treatment program was necessary" for Jane. Dr. Nodler stated that she had recommended sending Jane to Menninger to "just to try to keep [Jane] safe" while they could figure out what resources and options were available to place her in a long-term facility. Dr. Nodler stated that she had thought if they could get Jane into Menninger, then Jane "would be safe and I could trust that she could go there and get the treatment she needed, then we could look at the longer-term options for her." On direct examination, Dr. Nodler agreed that it was "fair to summarize" the goal at Menninger as being "stabilization" of Jane along with keeping her "physically safe" until a longer-term placement could be found.

Before he began cross-examination, Dani explained to Dr. Nodler that "the issue before the court" was "what constitutes an emergency under the terms of the decree." He stated, "[T]here is a provision [in the decree] that says that any medical

treatments should be, to the extent they can be controlled, confined to in-network medical facilities." He said that part of the issue was determining whether, at the end of February 2019, "the circumstances [were] so exigent that it required immediate hospitalization of [Jane]."

During cross-examination, Dr. Nodler indicated that she was aware that Dani had wanted Jane admitted to an in-network facility, such as Houston Behavioral Hospital, but Gavriella had wanted Jane admitted to The Menninger Clinic. Regarding admitting Jane to an in-network facility, Dr. Nodler testified that "there was a lot of refusal and concern that, you know, we couldn't force [Jane] and then we'd have to . . . traumatically get her there." She also testified that "forcing a teenager to do something . . . could rupture attachments and trust on a lot of different levels when there are other options potentially available."

Asked about the distinction between urgency and emergency with respect to Jane's hospitalization, Dr. Nodler testified, "If she is acutely suicidal, self-injuring, recent suicide attempt, conflict and disagreement among primary caregivers, you know, ruptured relationships in her peer groups that, in my mind, is an emergency and she's escalated, right, she's moved up and up and up in her efforts to end her life." When asked if that was how she would characterize Jane on February 28, 2019, Dr. Nodler stated that she had not seen Jane that day, but Jane fit "in that category

throughout that time period." Dr. Nodler stated that she had seen Jane "many times" and had been "wanting to hospitalize her or put her in longer-term treatment."

Dani also questioned Dr. Nodler about the fact that, despite the availability of a bed at Houston Behavioral Hospital and other in-network facilities, Gavriella had waited five or six days—until March 5—to hospitalize Jane when a bed opened at Menninger. In this regard, Dani asked Dr. Nodler: "[I]f it was that type of emergency, wouldn't the safest course of action have been to have gotten her immediate hospitalization as opposed to waiting almost five or six days?" Dr. Nodler responded that, had Jane been comatose or unable to make decisions, hospitalizing her immediately at the Houston Behavioral Hospital might have been best if there had been no other option. She explained that, because Jane was aware enough to engage in her treatment choices and was not acutely psychotic, or under the influence of drugs, it was a situation in which Dr. Nodler tried to help with the decision to determine where Jane would engage in treatment.

Dani then asked, "[R]egardless of what the patient might think about whatever facility there is that's available, isn't that less important than getting the patient into a facility as quickly as possible where they can be stabilized?" Dr. Nodler responded, "Yes and no." She explained that it was "very important" to get the patient "into a facility," but the difficulty with Jane was "physically" getting her to a facility other than Menninger and then getting her to participate in therapy. Dr. Nodler testified

13

that it was important for Jane to be admitted to a facility, but she believed that, because Jane trusted "the people at Menninger" and was "willing to go back there," that was "the best place for her to deal with her emergent symptoms, keep her safe, and . . . not rupture her trust." Dr. Nodler also testified that it was a "tough call" and that she had "lost sleep over it," but "it was worth the risk of not forcing [Jane] into a place where she could have come out . . . worse," given that they had another option—The Menninger Clinic—where Jane was willing to engage in therapy. Dr. Nodler also testified that she had not wanted to lose Jane's trust and make her angry. She stated that "anger in the face of suicide is a very, very powerful thing that doesn't often end well."

Dani asked whether two of the available in-network facilities—Houston Behavioral and Behavioral Hospital of Bellaire—had the ability "to have stabilized a patient such as [Jane] at that point in time?" Dr. Nodler testified, "They would have had the ability to try to do that. I don't think it would have been enough, but they—but they certainly could have tried."

Gavriella testified next and stated that she had recently graduated from the University of Houston Law Center and was waiting to take the bar exam. She said that during 2018–2019 she had earned no more than $12,000.

Gavriella explained that Jane was stable for almost a year after her discharge from Menninger in 2017. She testified that Jane began to deteriorate again in

November 2018, suffering from depression, refusing to attend school, and cutting herself. Jane overdosed around New Year's 2018 by swallowing an entire bottle of ibuprofen while on a family trip.

Gavriella explained that children who cut themselves usually do it in private. When Jane first began cutting herself, Gavriella did not know it because the cuts were on areas of her body that were not obvious, such as her inner thighs. But then the cutting became more pronounced. Gavriella described one episode where Jane had made 40–50 cuts on each arm from her wrist to her elbow. Gavriella testified that Jane had an agreement with Gavriella that she would tell Gavriella when she cut herself. Gavriella would then notify Jane's psychologist and psychiatrist.

Gavriella testified that at the end of February 2019 the situation worsened. Jane's cutting did not worsen but Jane's behavior became more impulsive. She stopped eating and acted "almost manic." Gavriella testified that even though she and Dani had locked up sharp objects and medications, they agreed that Jane needed in-patient treatment because she was no longer safe at home.

Dani was scheduled to have Jane and her younger brother at his house for the weekend of March 1–3, 2019. That weekend, Gavriella was scheduled to take their younger daughter to a cheer competition in Dallas. Gavriella testified that, on Thursday, February 28, 2019, Jane was "clearly not stable." She said that Dani

"really wanted [Jane] in an immediate hospital" but Jane refused to go anywhere other than Menninger, which did not have an open bed on that date.

Houston Behavioral Hospital, which was in-network, had an open bed, but Jane refused to go there. Gavriella said that, after her overdose, Jane had been admitted to Houston Behavioral for five days. Gavriella testified that the experience there had been "terrifying" to Jane. Gavriella mentioned that, at that time, they had to physically restrain Jane to get her to Houston Behavioral. Gavriella testified that Dani "made it clear" that Jane could not stay with him while they waited for a bed to open at Menninger, so Gavriella decided to take Jane with her to Dallas.

On Saturday, March 2, a friend of Jane, who lived in Dallas, asked to see her. Gavriella decided to allow Jane to go the girl's house for a couple of hours while the girl's parents were home. Gavriella stayed with her other daughter at the cheer competition. While at the friend's home, Jane shaved her head. Gavriella stated that Jane was immediately returned to Gavriella for the remainder of the weekend. After they returned to Houston, a bed opened at Menninger, and Jane was voluntarily admitted there. Jane remained at Menninger for three weeks.

Gavriella and Dani agreed it was not safe for Jane to come home after her discharge from Menninger and that she needed to be admitted to a longer-term residential treatment care facility. Gavriella testified that "the Menninger staff was unequivocal that [Jane] needed to go to a residential treatment center." Gavriella

16

began working with Robin Bullington, an educational placement consultant. Gavriella stated that Bullington "collaborates with Menninger and she helps families with placements in longer-term treatment facilities." Gavriella met with Bullington on March 13, 2019, and received information about facilities to consider. Dani was out of town for work on that date. Gavriella took notes during the meeting summarizing the information Bullington provided about possible facilities. Gavriella shared the document with Dani, and Gavriella's notes were admitted into evidence at the enforcement hearing.

Gavriella testified that although Bullington provided some information about the facilities, Bullington was "clear" that Gavriella and Dani needed to research the facilities themselves to find one appropriate for Jane. Gavriella testified that there were no options for Jane's placement in Texas. Many of the facilities were in Utah with "a smattering" in other states. The facilities recommended by Bullington included in-network programs. Gavriella testified that she contacted the in-network programs, but they were all full. Emails from two of the in-network programs showing that they did not have availability for two and three months, respectively, were admitted into evidence. Gavriella also testified that she tried to involve Dani in the selection process but, during that period, he was traveling internationally for work, and she had a difficulty getting in touch with him. She said there were multiple-day delays in his response to her messages.

17

After her discharge from Menninger, Jane was admitted to Visions Treatment Center, an out-of-network program in in Los Angles, California. Gavriella indicated that every long-term program required families to visit on the weekend in order to attend therapy. Gavriella testified that she and Dani have family in Los Angeles, which made the required weekend visits more convenient there. Gavriella described Visions as "an intensive residential treatment, which meant it was 45 days, minimum, but up to 90 days."

Jane was released from Visions after 88 days and returned home. She completed her senior year of high school, did well on the SAT exam, and was admitted to every college to which she applied. At the time of the hearing, Gavriella testified that Jane was a freshman at an out-of-state college and was doing well.

Gavriella offered additional documentary evidence to support the arrearages that she claimed Dani owed under the decree for the unreimbursed costs of Jane's treatment at Menninger and Visions, including an itemized invoice from Menninger and a summary of billing from Visions. She also offered into evidence a document showing her payments to Menninger and to Visions, including payment to Dr. Kiriakos, a pediatrician who treated Jane at Visions. Gavriella's evidence included a written appeal to Dani's insurance company drafted by Gavriella and signed by Dani. The appeal was successful, and they obtained an increase in the amount of reimbursement they received from the insurance company for Jane's treatment at

Visions. Gavriella's evidence also included the demand letter she sent to Dani, dated January 7, 2020. In the letter, she requested the arrearages she claimed Dani owed to her for unreimbursed medical expenses for Jane's psychiatric treatment. Attached to the letter were billing statements and other documents supporting Gavriella's reimbursement demand.

At the hearing, Gavriella explained that, because he was the primary insured on the policy, Dani received all explanations of benefits concerning Jane's treatment. She also testified that, between June and December 2019, Dani paid $12,000 of what he owed, but he had paid nothing further. Another of Gavriella's exhibits was a spreadsheet listing the arrearages Gavriella claimed Dani owed to her and crediting the $12,000 that he had paid. The spreadsheet showed that the outstanding total that Dani owed to her was $44,689.95.

Dani testified next. During his testimony, Gavriella pointed to an email sent by Dani to Drs. Nodler and Crawford on March 3, 2019. In the email, Dani stated that on February 28, 2019, he had wanted to have Jane admitted "into an acute inpatient" program while they figured out a long-term solution for Jane. When asked whether the email indicated that he believed at that time that Jane was experiencing an emergency, Dani responded that it did not mean he had believed Jane was experiencing an emergency. He stated that Jane's situation at that time had been "urgent" but not an "emergency."

As an example of an emergency, Dani cited Jane's attempted suicide when she had swallowed a bottle of ibuprofen. When that occurred, he had taken Jane to the emergency room where her stomach was pumped. He testified that he considered that incident to constitute an emergency because it was a life-threatening, dire situation. In contrast, Dani defined "urgent" to mean that, if they did not change Jane's course of treatment, then she would "get worse and potentially get into a more dangerous position." This meant that they had needed to "find a solution as expeditiously as possible and get her treatment."

Dani also testified that Houston Behavioral Hospital, which was an in-network facility on his insurance plan, had a bed available on February 28, 2019. He told Jane that he would take her there that night, but Jane resisted, and Gavriella supported Jane's refusal. Gavriella and Jane had wanted to wait until Menninger had an opening. Dani further testified that he had determined that two other in-network treatment facilities had openings on Monday, March 4. He contacted Gavriella on March 3 and told her that he could take Jane to one of those facilities on March 4. He testified that Gavriella had refused, stating that Jane needed to go to Menninger. Dani testified that a bed opened at Menninger on March 5, and Gavriella had Jane admitted there that day. Dani acknowledged that the parties agreed in the decree that Dr. Nodler would act as the tie-breaker when he and Gavriella disagreed about Jane's

20

psychiatric treatment, but Dani said a tie-breaking decision was only relevant to the type of treatment Jane would receive.

Dani agreed that, once Jane was discharged from Menninger in March 2019, she needed continued care, and he acknowledged that Jane had needed to be admitted to a longer-term residential treatment facility immediately after her discharge from Menninger with no gap in between discharge from Menninger and admission to the longer-term facility. But Dani also claimed that there were several longer-term in-network facilities where Jane could have received treatment.

Dani acknowledged that he had the funds to pay the arrearages that Gavriella claimed he owed. But he maintained that, because Gavriella made a unilateral decision to use out-of-network facilities, she accepted responsibility for the costs.

Gavriella's attorney stated on the record that the parties had "agreed to stipulate to each other's attorney's fees." He stated that Gavriella had incurred $12,500 in attorney's fees to prosecute the enforcement action. To support that amount, Gavriella also offered her attorney's billing records.

At the end of the hearing, the trial court asked the parties to brief the issue of what constituted a psychiatric emergency, and the parties complied.

On November 22, 2020, the trial court signed an enforcement order granting most of the relief requested by Gavriella. In the order, the trial court found that Dani had failed to pay, as ordered, eight of the ten separate amounts of medical child

support that Gavriella claimed that he owed to her. The court found the medical child support had been due on various dates between March 5 and June 19, 2019 and that Dani "was able to pay child support in the amounts and on the dates ordered as set out above." The court determined that Dani was "guilty of a separate act of contempt for each such separate failure to pay child support in the amounts ordered" and that, on the date of the enforcement hearing, Dani "had the ability to comply with the Order of the Court by paying the child support arrearages set forth in violations 1 through 8, enumerated above." The court further found and confirmed that Dani was "in arrears in the amount of $44,633.34 for the medical/psychiatric/psychological costs outlined above, and that Judgment should be awarded against [Dani] in the amount of $44,633.34 for the arrearages and interest." Finally, the court found that $12,500 in attorney's fees should be assessed against Dani.

After making these findings, the trial court "adjudged" Dani to be "in contempt for each separate violation" of failing to be medical child support "enumerated above." The court ordered Dani "confined in the County jail of Harris County, Texas, for a period not to exceed one hundred eighty (180) days" for each of the eight violations of failing to pay medical child support or until Dani paid Gavriella $44,633.34 and paid the $12,500 attorney's fees, "whichever occurs first." The trial court suspended Dani's jail confinement on the condition that he pay Gavriella the total amount of arrearage, $44,633.34, by January 4, 2021, and that he

pay Gavriella's attorney his fees in four equal monthly installments beginning on January 1, 2021.

The enforcement order also included a cumulative money judgment granted to Gavriella for medical child support arrearages against Dani totaling $44,633.34, plus interest. At Dani's request, the trial court issued findings of fact and conclusions of law.

Dani filed a petition for writ of mandamus in this Court, challenging the order holding him in contempt. He also filed a motion for emergency relief, requesting the contempt order be stayed. On December 21, 2020, we granted Dani's motion for emergency relief, staying enforcement of the contempt order pending disposition of the mandamus proceeding. In addition, Dani filed a notice of appeal challenging the cumulative money judgment and attorney's fees award contained in the enforcement order.

### Challenge to Contempt Order by Petition for Writ of Mandamus

In his mandamus petition, Dani raises three issues challenging the contempt provision (contempt order) contained in the trial court's enforcement order.

### A.      Availability of Mandamus Relief and Standard of Review

Contempt orders are not reviewable by appeal. *See Cline v. Cline*, 557 S.W.3d 810, 812 (Tex. App.—Houston [1st Dist.] 2018, no pet.). This is true even when, as here, the contempt order is appealed along with a judgment that is appealable. *See*

*id.* Instead, contempt orders are reviewed only by petition for writ of mandamus or habeas corpus. *See In re Janson*, 614 S.W.3d 724, 727 (Tex. 2020). When the contemnor is not jailed, the proper vehicle to challenge a contempt order is a petition for writ of mandamus. *Id.* Here, the trial court suspended Dani's jail commitment conditioned on his subsequent payment of arrearages and attorney's fees. Thus, the trial court's contempt order is reviewable by petition for writ of mandamus. *See In re Thompson*, No. 01-14-00235-CV, 2014 WL 6792031, at *1 (Tex. App.—Houston [1st Dist.] Dec. 2, 2014, orig. proceeding) (mem. op.) (reviewing, in mandamus proceeding, contempt order that ordered relator confined to jail for 90 days for each child-support violation but suspending jail commitment on condition that relator pay arrearages every month until paid); *In re Honermann-Garinger*, No. 02-10-00361-CV, 2010 WL 4644464, at *4 (Tex. App.—Fort Worth Nov. 17, 2010, orig. proceeding) (mem. op.) (construing application for writ of habeas corpus as mandamus petition when contempt order suspended confinement on condition that relator paid attorney's fees and otherwise complied with underlying order).

We grant the extraordinary relief of writ of mandamus only when the trial court has clearly abused its discretion and the relator lacks an adequate appellate remedy. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 259 (Tex. 2008) (orig. proceeding). Because there is no adequate remedy by appeal for Dani's challenge to the contempt order, the question remaining here is whether the trial court abused its

discretion in rendering the order. A trial court abuses its discretion when its decision is arbitrary, unreasonable, and without reference to guiding principles. *In re A.L.M.-F.*, 593 S.W.3d 271, 282 (Tex. 2019). Because a trial court has no discretion in determining what the law is or in applying it to the facts, a trial court also abuses its discretion if it fails to correctly analyze or apply the law. *In re Dawson*, 550 S.W.3d 625, 628 (Tex. 2018).

## B.    Analysis

In his second and third issues, Dani contends that the contempt order is void because Gavriella's amended motion to enforce did not provide him reasonable notice of how he had violated the Agreed Divorce Decree, and he asserts that the decree was not enforceable by contempt because it is "vague and ambiguous."

### 1.    *Adequacy of Motion to Enforce*

Because the obligation to pay child support is a duty, not a debt, a person may be held in contempt and imprisoned for failing to pay child support. *In re C.F.*, 576 S.W.3d 761, 770 (Tex. App.—Fort Worth 2019, orig. proceeding); *see* TEX. FAM. CODE §§ 157.001, 157.166–.167. Medical support is a child-support obligation, TEX. FAM. CODE § 154.183, and it is also enforceable by contempt, *C.F.*, 576 S.W.3d. at 770.

Contempt proceedings are quasi-criminal in nature, and the contemnor is entitled to procedural due process throughout the proceedings. *Ex parte Davis*, 305

S.W.3d 326, 330 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding). Contempt that occurs outside of the court's presence, as alleged here, is constructive contempt. *In re Reece*, 341 S.W.3d 360, 365 (Tex. 2011). Before a court can punish an alleged contemnor for constructive contempt, due process requires that the accused have full and complete notification of the contemptuous act. *Ex parte Carney*, 903 S.W.2d 345, 346 (Tex. 1995); *In re Butler*, 45 S.W.3d 268, 272 (Tex. App.—Houston [1st Dist.] 2001, orig. proceeding). More precisely, a constructive contemnor "must have full and complete notification of the subject matter, and the show cause order or other means of notification must state when, how, and by what means the defendant has been guilty of the alleged contempt." *In re Parks*, 264 S.W.3d 59, 62 (Tex. App.—Houston [1st Dist.] 2007, orig. proceeding). A contempt order rendered without adequate notice is void. *In re Vasos*, No. 01-17-00841-CV, 2018 WL 1954164, at *3 (Tex. App.—Houston [1st Dist.] Apr. 26, 2018, orig. proceeding) (mem. op.); *see Ex parte Gordon*, 584 S.W.2d 686, 688 (Tex. 1979) ("A contempt judgment rendered without . . . notification is a nullity."). In an original proceeding challenging a contempt order, the relator has the burden to show that the order is void. *Thompson*, 2014 WL 6792031, at *1.

To assure full and complete notification, Family Code section 157.002 sets out the pleading requirements for enforcement motions. *See Butler*, 45 S.W.3d at 272. Section 157.002 requires an enforcement motion for child support to include

26

the amount owed, the amount paid, and the amount of arrearages. TEX. FAM. CODE § 157.002(b)(1). If contempt is requested, the motion must also include "the portion of the order allegedly violated and, for each date of alleged contempt, the amount due and the amount paid, if any." *Id.* § 157.002(b)(2). "Thus, a respondent may be found in contempt only for violations that are specifically pled in the motion for enforcement under section 157.002." *In re Office of Attorney Gen.*, 422 S.W.3d 623, 630 (Tex. 2013).

Dani contends that "[t]he Contempt Order is void because the motion to enforce failed to comply with the due process notice requirements of Texas Family Code section 157.002." Among his arguments, Dani asserts that Gavriella's amended motion to enforce did not inform him of the dates of his alleged contemptuous acts as required to comply with the notice requirements of section 157.002(b) and with due process. *See* TEX. FAM. CODE § 157.002(b)(2).

In her enforcement motion, Gavriella alleged that Dani should be held in contempt for 10 violations of failing to pay her medical child support as required in the Agreed Divorce Decree. Specifically, she alleged that Dani had failed to reimburse her—as required by the decree's provisions cited in her motion—for his share of 10 separate health-care expenses that she incurred for Jane's psychiatric treatment. As mentioned above, Gavriella provided the following information about the 10 alleged violations in her amended enforcement motion:

27

| Violation | Date Paid By Petitioner | Health Care Provider | Net Amt. Movant Paid |
|-----------|------------------------|----------------------|----------------------|
| 1. | 3-5-2019 | Menninger Clinic | $21,991.71 |
| 2. | 3-19-2019 | Visions Treatment Ctr. | $ 6,000.00 |
| 3. | 3-20-2019 | Menninger Clinic | $11,169.74 |
| 4. | 3-22-2019 | Visions Treatment Ctr. | $20,000.00 |
| 5. | 3-26-2019 | Carol Kiriakos, M.D. | $ 1,875.00 |
| 6. | 3-27-2019 | Visions Treatment Ctr. | $50,500.00 |
| 7. | 4-26-2019 | Carol Kiriakos, M.D | $ 786.85 |
| 8. | 5-22-2019 | Carol Kiriakos, M.D | $ 633.44 |
| 9. | 5-29-2019 | Visions Treatment Ctr. | $25,500.00 |
| 10. | 6-17-2019 | Visions Treatment Ctr. | $ 6,800.00 |

Dani points out that Gavriella identified the dates that she paid the health-care expenses, but she did not identify the dates by which Dani was required to reimburse her for his share of the expenses pursuant to the decree's provisions. In other words, Dani asserted that Gavriella did not provide the dates that he had allegedly committed contempt by failing to reimburse Gavriella for the health-care expenses.

In her amended enforcement motion, Gavriella asserted that Dani had violated several provisions of the decree, including the provision setting the deadline for when the party not incurring the health-care expense must reimburse the incurring party for the expense. That provision requires the parent who incurred the health-care expense to furnish forms, receipts, bills, and explanations of benefits reflecting the uninsured portion of the expense within 30 days after the incurring party received

28

the documentation. The non-incurring party must then pay his or her percentage of the health-care expense required by the decree either by paying the health-care provider directly or by reimbursing the incurring party for any advance payment exceeding that party's percentage "within thirty days after the non-incurring party receives the forms, receipts, bills, statements, and/or explanations of benefits." However, if the incurring party "fails to submit to the other party forms, receipts, bills, statements, and explanations of benefits reflecting the uninsured portion of the health-care expenses within thirty days after the incurring party receives them," then the nonincurring party must pay his or her percentage of the uninsured portion "either by paying the health-care provider directly or by reimbursing the incurring party for any advance payment exceeding the incurring party's percentage of the uninsured portion of the health-care expenses within 120 days after the non-incurring party receives the forms, receipts, bills, statements, and/or explanations of benefits."

We agree with Dani that the dates that Gavriella paid the health-care expenses do not provide Dani with notice of when he allegedly violated the Agreed Divorce Decree. As Dani points out, the dates that Gavriella paid the expenses is not the date by which reimbursement is required in the decree nor is it a factor in calculating when he was required to reimburse her.

29

Gavriella contends that her amended enforcement motion adequately provided Dani notice of the date he violated the decree. In the motion, Gavriella stated, "All sums have been requested from [Dani] as required by the Court's prior Order (at the latest, in a written request addressed to [Dani] and dated **January 7, 2020**), and all conditions precedent to the collection of these sums and the filing of this Enforcement action have been performed. . . ." (Emphasis in original.) In apparent reference to the provision of the decree applicable to calculating reimbursement deadlines, Gavriella asserts that "[t]he fact that [her] Amended Motion requires Dani to add 120 days to January 7 can hardly be said to have rendered the Motion unreasonably vague, or to have deprived him of due process."

But Gavriella did not inform Dani whether she had sent him her demand for reimbursement, along with the required documentation supporting the request, more than 30 does after she received it or less than 30 days. Gavriella does not explain how Dani should have known whether Gavriella sent the January 7 request more than 30 days after receiving "the forms, receipts, bills, and explanations of benefits" reflecting the uninsured expense or sent it less than 30 days after receiving the documents. Although Gavriella referenced the January 7 request in her amended enforcement motion, the request and the documentation supporting it was not attached to the motion. While it could be argued that Gavriella would not have paid

30

the health-care expenses without first receiving the billing statements, the motion itself does not make that allegation.

In her response to the mandamus petition, Gavriella points out that Dani acknowledged receiving her January 7 demand letter and that, as the primary insured, Dani had received the explanation of benefits for the charges from his insurance company. However, Gavriella does not explain how either was a permissible substitute for notifying Dani in the enforcement motion of the dates he was allegedly guilty of committing contempt by failing to pay her medical child support as required by the terms of the decree—terms that she cited as a basis for holding Dani in contempt.

We conclude that the amended motion for enforcement did not satisfy the minimum requirements of due process because it failed to provide Dani with adequate notice of the dates of his alleged contemptuous acts of failing to pay Gavriella medical child support. *See* TEX. FAM. CODE § 157.002(b)(2) (requiring enforcement motion to include amount due for *each date of alleged contempt*); *In re K.M.M.*, No. 14-15-00204-CV, 2016 WL 6108097, at *5 (Tex. App.—Houston [14th Dist.] Oct. 18, 2016, orig. proceeding) (mem. op.) ("Notice of the contempt allegations must state when, how, and by what means the person has been guilty of contempt."). Thus, the contempt order is void, and we hold that the trial court abused its discretion in rendering it.

Because he did not receive adequate notice of the contempt allegations, we sustain Dani's second issue.

## 2. *Ambiguity of Agreed Divorce Decree*

In his third issue, Dani claims that the decree's provision setting the deadline by which a party must pay his or her percentage of a health-care expense is vague and ambiguous. The provision states in full as follows:

> The party who incurs a health-care expense on behalf of a child is ORDERED to furnish the other party forms, receipts, bills, statements, and explanations of benefits reflecting the uninsured portion of the health-care expenses within thirty days after the incurring party receives them. The non-incurring party is ORDERED to pay the non-incurring party's percentage of the uninsured portion of the health-care expenses either by paying the health-care provider directly or by reimbursing the incurring party for any advance payment exceeding the incurring party's percentage of the uninsured portion of the health-care expenses within thirty days after the non-incurring party receives the forms, receipts, bills, statements, and/or explanations of benefits. However, if the incurring party fails to submit to the party forms, receipts, bills, statements, and explanations of benefits reflecting the uninsured portion of the health-care expense within thirty days after the incurring party receives them, IT IS ORDERED that the non-incurring party shall pay the non-incurring party's percentage of the uninsured portion of the health-care expenses either by paying the health-care provider directly or reimbursing the incurring party for any advance payment exceeding the incurring party's percentage of the uninsured portion of the health-care expenses within 120 days after the non-incurring party receives the forms, receipts, bills, statements, and/or explanations of benefits .

Because criminal contempt is a harsh sanction, courts strictly require clarity in the underlying court orders. *Janson*, 614 S.W.3d at 727. A trial court necessarily abuses its discretion if it holds a person in contempt for violating an ambiguous

order. *Id.* To avoid such ambiguity, the order allegedly violated must "set forth the terms of compliance in clear, specific and unambiguous terms so that the person charged with obeying the decree will readily know exactly what duties and obligations are imposed upon him." *Ex parte Chambers*, 898 S.W.2d 257, 260 (Tex. 1995). The order's interpretation may not rest upon implication or conjecture. *Janson*, 614 S.W.3d at 727.

Pursuant to the above provision, the date that a non-incurring party's payment is due is contingent upon whether the incurring party furnishes the required documentation 30 days after he or she receives it. Dani contends that the provision is too vague and ambiguous to be enforced by contempt because it requires the party who did not incur the health-care expense to engage in conjecture about when his or her payment is due. We agree.

The question of whether an order is enforceable by contempt depends on whether the order is definite and certain, and the focus is on the wording of the judgment itself. *Ex parte Reese*, 701 S.W.2d 840, 841 (Tex. 1986). "Texas law has long held that a judgment must be sufficiently definite and certain to define and protect the rights of all litigants, or it must provide a definite means of ascertaining such rights so the judgment can be executed without reference to facts not stated within the judgment." *In re Medina*, No. 04-20-00390-CV, 2021 WL 603360, at *2 (Tex. App.—San Antonio Feb. 17, 2021) (mem. op.) (quoting *In re D.A.I.*, No. 04-

33

06-00434-CV, 2007 WL 1988153, at *2 (Tex. App.—San Antonio July 11, 2007, no pet.) (mem. op.)). The complained-of provision here fails to meet this standard. As Dani points out, the decree "does not provide any clarification as to how the non-incurring party is supposed to know when the incurring party received the forms and whether the incurring party actually furnished the forms within thirty days" of receiving them. The decree does not instruct the incurring party to inform the non-incurring party of when he or she received the required documentation, nor does it provide a mechanism for the non-incurring party to make that determination.

While assumptions about the date the incurring party received the documents could be made, "[a] trial court's judgment of contempt 'should not rest upon implication or conjecture.'" *In re Luther*, 620 S.W.3d 715, 722 (Tex. 2021) (quoting *Ex parte Slavin*, 412 S.W.2d 43, 44 (Tex. 1967) (orig. proceeding)). Instead, to support a contempt judgment, the decree must "spell out the details of compliance in clear, specific and unambiguous terms so that such person will readily know exactly what duties or obligations are imposed upon him." *Ex parte Slavin*, 412 S.W.2d at 44. Here, the Agreed Divorce Decree fails to spell out the details of compliance because it does not provide a mechanism for ascertaining whether the incurring party furnished the required documents to the non-incurring party within 30 days of receipt. Thus, the provision's uncertainty and indefiniteness impermissibly compels the non-incurring party to engage in conjecture and

speculation about his or her payment deadline. *See id.*; *see also In re Medina*, 2021 WL 603360, at *2 (concluding that, because decree's language requiring father to pay medical support to mother if she relocated children's primary residence to Mexico was ambiguous and "impermissibly contingent and uncertain," it could not be enforced by contempt).

We conclude that the indefiniteness and uncertainty of the provision establishing the non-incurring party's deadline to reimburse the incurring party for health-care expenses renders the decree vague and ambiguous. The decree is not sufficiently clear to support the trial court's contempt finding. *See Janson*, 614 S.W.3d at 728; *Ex parte Slavin*, 412 S.W.2d at 44; *Chambers*, 898 S.W.2d at 260. We hold that, because the decree is vague and ambiguous, the trial court abused its discretion when it rendered the contempt order against Dani. *See Janson*, 614 S.W.3d at 728.

For the reasons discussed, we sustain Dani's third issue.[4]

### 3.    *Conclusion Regarding Mandamus Relief*

To summarize, we hold that the trial court abused its discretion when it held Dani in contempt because Gavriella's enforcement motion did not provide him with

---

[4]    Because our resolution of Dani's second and third issues is sufficient to grant his requested mandamus relief, we need not discuss his first issue, nor do we need to discuss additional arguments for his requested relief that he raises in his second and third issues. *See* TEX. R. APP. P. 47.1.

sufficient notice of the dates of the alleged violations of the decree and because the decree is not sufficiently clear to support enforcement by contempt. Dani also does not have an appellate remedy for his challenge to the contempt order. Therefore, Dani is entitled to his requested mandamus relief. *See id.* We conditionally grant mandamus relief directing the trial court to vacate its order holding Dani in contempt. Our writ will issue only if the court fails to comply.

## Appeal of Enforcement Order

In two issues, Dani appeals the enforcement order.[5] In the order, the trial court confirmed that Dani was "in arrears in the amount of $44,633.34 for . . . medical/psychiatric/psychological costs." The court granted Gavriella a cumulative judgment for medical child support arrearages against Dani for that amount, plus interest. The court also awarded Gavriella her attorney's fees of $12,500 to be paid to her attorney.

---

[5] Before Dani filed his appellate brief, Gavriella filed a motion to dismiss Dani's appeal. She pointed out that contempt orders are not reviewable by appeal. *See Cline v. Cline*, 557 S.W.3d 810, 812 (Tex. App.—Houston [1st Dist.] 2018, no pet.). She asserted that, because Dani was improperly attempting to challenge the contempt order in his appeal, his appeal should be dismissed. *See id.* Dani properly challenged the contempt order only in his mandamus petition. On appeal, Dani raises no issues relating to the contempt order. Dani challenges only the cumulative money judgment portion of the enforcement order and the attorney's fees award, which we have jurisdiction to consider. *See id.*; *In re E.H.G.*, No. 04-08-00579-CV, 2009 WL 1406246, at *5 (Tex. App.—San Antonio May 20, 2009, no pet.) (mem. op.) ("If a motion to enforce includes a request for both a contempt finding and a money judgment for child support arrearage, an appellate court has jurisdiction to address the arrearage judgment because it is unrelated to the contempt order."). Thus, we deny Gavriella's motion to dismiss the appeal.

## A.	Cumulative Money Judgment

In his first issue, Dani challenges the trial court's confirmation of the arrearages amount and the rendition of the cumulative judgment for $44,633.34.

### 1.	*Standard of Review*

We review a trial court's decisions regarding child support, including confirmation of child-support arrearages, for abuse of discretion. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Cline*, 557 S.W.3d at 813. "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable." *Worford*, 801 S.W.2d at 109. A trial court also abuses its discretion by failing to analyze or apply the law correctly. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011).

Under the abuse-of-discretion standard, legal and factual sufficiency of the evidence are not independent grounds of error, but are merely factors to be considered in determining whether the trial court abused its discretion. *Cline*, 557 S.W.3d at 813. We engage in a two-pronged inquiry: (1) whether the trial court had sufficient information upon which to exercise its discretion and (2) whether the trial court erred in its application of that discretion. *Id.* The focus of the first step is the sufficiency of the evidence. *Id.* Under the second step, we must decide whether, based on the evidence before it, the trial court made a reasonable decision. *Id.*

## 2.    *Analysis*

Dani asserts that the trial court abused its discretion in awarding Gavriella a cumulative money judgment for $44,633.34. That sum represents the total amount of arrearages the trial court found Dani owed Gavriella for his 2/3 share of the health-care expenses that Gavriella incurred for Jane's treatment at Menninger and at Visions that were not reimbursed by health insurance.

Dani does not dispute that the Agreed Divorce Decree requires him to two-thirds of "the unreimbursed health-care expenses" for the children's "reasonable and necessary health-care expenses," which included psychiatric costs. Instead, Dani contends that he was not required to pay Gavriella for the unreimbursed costs for Menninger and Visions (including the charges of Dr. Kiriakos, a pediatrician with Visions) because those providers were not in-network "preferred providers" under his health-insurance policy, that is, they were out-of-network providers.

Dani points out that the Agreed Divorce Decree orders the parties to use in-network providers, unless an exception to using an in-network provider applies. If no exception applies, then the party incurring the out-of-network health-care expense must pay the total amount of the expense. Dani claims no exception applies here. For this reason, Dani asserts that Gavriella is responsible for 100 percent of the unreimbursed charges she incurred for Jane's treatment at out-of-network providers

38

Menninger and Visions, and the trial court abused its discretion in determining that he had to reimburse Gavriella for his 2/3 share of those charges.

To determine whether the trial court abused its discretion here, we must interpret the Agreed Divorce Decree. "An agreed divorce decree is a contract subject to the usual rules of contract interpretation."[6] *Chapman v. Abbot*, 251 S.W.3d 612, 616 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Our primary concern when interpreting an agreed divorce decree is to ascertain and give effect to the intent of the parties as it is expressed in the agreement. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Perry v. Perry*, 512 S.W.3d 523, 527 (Tex. App.—Houston [1st Dist.] 2016, no pet.). To achieve this objective, courts should examine the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Chapman*, 251 S.W.3d at 616.

### a. Visions Health-Care Expenses

We begin by determining whether the trial court abused its discretion in determining that Dani was required to pay Gavriella for the health-care expenses she incurred at Visions, the out-of-network long-term residential facility in Los Angeles where Jane stayed for 88 days after her three-week stay at Menninger. The arrearages

---

[6] The Agreed Divorce Decree provides, "The Court finds that the parties have entered into a written agreement as contained in this decree by virtue of having approved this decree as to both form and substance. *To the extent permitted by law, the parties stipulate the agreement is enforceable as a contract*." (Emphasis added.)

the trial court assessed against Dani for the costs Gavriella incurred at Visions (including Dr. Kiriakos's charges) were $34,547.79 out of the total arrearages of $44,633.66 assessed against Dani.

The provision in the Agreed Divorce Decree governing the use of in-network versus out-of-network providers, states:

> Each party is ORDERED to use "preferred providers," or services within the health maintenance organization or preferred provider network, if applicable. Disallowance of the bill by a health insurance company shall not excuse the obligation of either party to make payment. Excepting emergency health-care expenses incurred on behalf of the children, if a party incurs health-care expenses for the children using "out-of-network" health-care providers or services, or fails to follow the health insurance company procedures or requirements, that party shall pay all (100%) of such health-care expenses incurred absent: (1) written agreement of the parties allocating such health-care expenses; or (2) further order of the Court.

Relevant here, the provision reflects that the party incurring an out-of-network health-care expense will not be 100 percent responsible for it if the expense is an emergency health-care expense. In its conclusions of law, the trial court ruled that, because Jane's circumstances constituted an emergency as contemplated by the decree, Gavriella was not required to choose an in-network provider. Dani asserts that the conclusion is erroneous with respect to the expenses incurred at Visions because the evidence showed that, by the time Jane was admitted there, her condition had stabilized. Gavriella disagrees, asserting that the evidence showed that Jane was still experiencing a psychiatric emergency when she was admitted to Visions.

40

We need not, however, determine whether the emergency health-care expense exception to using an in-network provider applies to the expenses Gavriella incurred at Visions. Under the above provision, the parties are required to use an in-network provider only "if applicable." In other words, if there is not an "applicable" in-network provider to use, the provision does not apply.

The Austin Court of Appeals recently held in *McCain v. McCain* that this same "if applicable" language in a decree supported the trial court's arrearage award for an of out-of-network charge. No. 03-19-00751-CV, — S.W.3d —, 2021 WL 4995499, at *6 (Tex. App.—Austin Oct. 28, 2021, no pet.). There, the trial court made an arrearage award against the appellant, Sean, in favor of his ex-wife, Elizabeth, for charges she incurred for the out-of-network therapy of their son, M.M. *Id.* The decree there, like the decree here, required each party "to use 'preferred providers,' or services within the health maintenance organization, *if applicable*." *Id.* (emphasis added). Sean cited the provision to support his argument that the trial court abused its discretion in awarding Elizabeth the out-of-network charges for their son's therapy. *Id.*

Overruling Sean's argument, the court wrote:

The first provision that Sean cites requires the use of a preferred provider, but only "if applicable." While Elizabeth admitted that M.M.'s therapist was not a preferred provider, she also testified that she "tried" to find preferred providers to provide the challenged therapy to M.M. but that, of the few therapists who will see children of "high-conflict divorces," "those that will" see such children do not accept

41

insurance because they "know that they don't need to go through insurance so they don't." We conclude that this constituted legally and factually sufficient evidence to support the trial court's implied finding that use of a preferred provider was not "applicable" under such circumstances.

*Id.* (internal footnotes omitted).

Here, in its findings of fact, the trial court found that Gavriella "made a substantial, good-faith effort to find an appropriate, acceptable in-network long-term care facility to which [Jane] could be transferred following her discharge from The Menninger Clinic." The evidence in the record supports the trial court's finding.

In her January 7 demand letter to Dani, Gavriella cited the decree's "if applicable" language, pointing out that "[a] preferred provider recommended by consultant Bullington was not available for the type of care [Jane] required" after her discharge from Menninger. At the enforcement hearing, Gavriella testified that on March 13, 2019, she met with Bullington, a consultant who collaborates with Menninger and helps with placement in long-term residential facilities. At the meeting, Gavriella received information from Bullington about facilities to consider for Jane's residential placement after she was discharged from Menninger. Gavriella took notes during the meeting summarizing the information Bullington provided about prospective facilities. Gavriella shared the document with Dani, who did not attend the meeting. Gavriella's notes from the meeting were admitted into evidence.

At the hearing, Gavriella testified that, although Bullington provided information about the facilities, she told Gavriella that she and Dani would be responsible for researching the facilities to find an appropriate one for Jane. The evidence, including Dani's testimony, showed that a residential facility needed to be found before Jane's discharge from Menninger because Menninger's purpose was to stabilize Jane, not to serve as a long-term residential facility. Dani, Gavriella, and Dr. Nodler all agreed that Gavriella needed further treatment after she left Menninger. Dani also testified that, when Jane was discharged from Menninger, she needed to go immediately to a long-term placement without a gap in between the two. Thus, the evidence indicated that there was a limited amount of time to research and find a suitable long-term residential facility.

Gavriella testified that she tried to involve Dani in the selection process but, during that time, he was traveling internationally for work, and she had difficulty getting in touch with him. She said there were multiple-day delays in his response to her messages.

Gavriella's testimony and her notes indicate that she researched prospective facilities, including in-network facilities. Gavriella testified that there were no options for Jane's placement in Texas. She explained that many of the residential facilities were in Utah with "a smattering" in other states. Gavriella testified that she tried to find an in-network program not only because Dani wanted it to be in-network

43

but because she was paying for 1/3 of the cost. She stated that the facilities recommended by Bullington included in-network facilities. Gavriella testified that she contacted the in-network facilities recommended by Bullington, but they were full and had no availability in the required time-frame. Emails from two in-network programs were admitted into evidence. In the emails, one of the facilities stated that it did not have availability for two months, and the other indicated that it did not have availability for three months.

Gavriella also stated that a consideration in selecting a program was to find one where Jane could connect with peer groups "because that's part of the treatment program." For example, a program with other teens that were substance dependent would not have been a good fit for Gavriella because her issues were depression, anxiety, and suicidal ideation.

Gavriella testified that she selected Visions in Los Angeles for Jane's placement. Gavriella explained that she and Dani have family in Los Angeles, which made the required weekend visits more convenient there. Visions had been highly recommended by Bullington and it fit Jane's needs. Gavriella described Visions as "an intensive residential treatment [program], which meant it was 45 days, minimum, but up to 90 days." Visions also had a step-down program, so that if Jane had not been ready to come home after 90 days, she could have moved to off-campus housing there to attend school. Gavriella testified that some of the other programs

were not intensive residential treatment programs but were instead nine to twelve month programs. She explained that those facilities did not have openings because their schedules followed the school year, and it was March when Jane was discharged from Menninger. She explained that the population of teens in those facilities often changed throughout the year, so that Jane's peer group may no longer be a fit there as the year progressed.

In his brief, Dani points to Gavriella's notes from her meeting with Bullington. At the top of the notes was the notation "Inquiries with Space." Under that phrase was a table with information about different facilities. Dani writes that "[t]hree of the facilities with space were in-network facilities located in or near Los Angeles." He points to another listed facility that was in Malibu, California. For the Malibu facility, Gavriella's notes indicate that the insurance verification came back at "90% of rate" with an estimated out-of-pocket cost at $10,000 if the facility billed the insurance company $45,000, but the notes did not state that any of the facilities were in-network or, as referred to in the decree, "preferred providers." Nor was the Malibu facility's suitability for Jane's treatment needs indicated in the document. Dani claims that the notation "Inquiries with Space" meant that all the facilities listed had availability for Jane. However, Dani did not question Gavriella about what the phrase meant, and Gavriella testified that none of the in-network facilities recommended by Bullington had space. From the evidence, the trial court could have

reasonably inferred that these facilities cited by Dani were not in-network "preferred providers," even if the facilities billed the insurance company for reimbursement.

We note that Dani also testified that he provided Gavriella with the names of three in-network facilities in Los Angeles, but she refused to contact them. He also testified that he had been available to consult about the choice of a residential treatment facility even though he had been traveling for work. He indicated that Gavriella had excluded him from the process of selecting a program and that she had told him that she did not want to use an in-network facility. However, the trial court, as the sole judge of the credibility of the witnesses and the weight to be given their testimony, was entitled to accept Gavriella's testimony and disbelieve Dani's testimony. *See Woody v. Woody*, 429 S.W.3d 792, 797 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

We conclude that there was legally and factually sufficient evidence to support the trial court's finding of fact that Gavriella "made a substantial, good-faith effort to find an appropriate, acceptable in-network long-term care facility to which [Jane] could be transferred following her discharge from The Menninger Clinic." This finding, along with record evidence showing that a suitable in-network provider was not available, supports a legal conclusion that the use of an in-network provider was not "applicable" under the circumstances for Jane's long-term residential treatment. *See McCain*, 2021 WL 4995499, at *6; *see also Delgado v. Garza*, No.

46

13-15-00344-CV, 2018 WL 6187077, at *11 (Tex. App.—Corpus Christi Nov. 27, 2018, pet. denied) (mem. op.) (recognizing that incorrect or omitted conclusions of law will not require reversal if controlling findings of fact support correct legal theory) (citing *Highland Credit Opportunities CDO, L.P. v. UBS AG*, 451 S.W.3d 508, 519 (Tex. App.—Dallas 2014, no pet.) (providing that "the conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence; incorrect conclusions of law will not require reversal if the controlling findings of fact will support a correct legal theory")). Thus, we hold that the trial court did not abuse its discretion when it (1) confirmed the arrearages, totaling $34,547.79, owed by Dani to Gavriella for the health-care expenses incurred at Visions and (2) included that amount in its cumulative money judgment.

### b. Menninger Health-Care Expenses

The trial court also confirmed arrearages of $10,085.55 for the health-care expenses Gavriella incurred for Jane's three-week stay at Menninger, an out-of-network provider. In the trial court, Gavriella asserted that she was entitled to reimbursement of the Menninger health-care expenses from Dani because the emergency health-care expenses exception applied. Gavriella argued that the expenses she incurred from Menninger were "emergency health-care expenses" because Jane was experiencing a psychiatric emergency when she was admitted.

47

Gavriella also claimed that she was entitled to reimbursement under the "tie-breaker" provision in the decree. That provision provides that, "in the event the parties do not reach mutual agreement on decisions regarding psychiatric treatment of [Jane] (other than in an emergency), then the parties shall follow the recommendation of [Jane's] treating psychiatrist, Abigail Nodler, M.D." Gavriella asserts that when she and Dani disagreed about where Jane should initially be admitted, Dr. Nodler provided the tie-breaking decision in her March 4, 2019 email. In the email, Dr. Nodler stated that she thought that "an admission to Menninger [was] the best option for [Jane's] acute care." Gavriella asserted that because Dr. Nodler chose Menninger as the place for Jane's treatment, Dani was required to pay his share of the expenses from Menninger, irrespective of being out-of-network.

The trial court agreed with Gavriella's theories of recovery. In its conclusions of law, the trial court ruled:

- In early March of 2019 [Jane] faced a psychiatric emergency that required immediate action by her parents.

- Because [Jane's] circumstances did constitute an "emergency" as contemplated by the parties' Final Decree of Divorce, and because the parties' "tiebreaker" psychiatrist recommended the precise course of action that was ultimately followed, [Gavriella] was free to choose the best available and most appropriate psychiatric and mental-health care interventions for [Jane] regardless of the providers' "network" status for insurance coverage purposes.

Related to these conclusions, the trial court made the following findings of fact:

- In late February and early March of 2019, [Jane] was in "acute distress" and a downward psychiatric spiral characterized by her treating psychiatrist as

"life-threatening," including relapse of her major depressive disorder, dangerous behaviors such as self-harm (cutting and overdose), and increased suicidal ideation.

- In early March 2019, Respondent Dani Roisman expressly agreed that [Jane] needed immediate in-patient (and subsequent long-term) care to ensure her health and safety, as he was incapable of providing her with needed care in his home.

- In early March 2019, [Gavriella] and [Dani] disagreed as to the proper location for [Jane's] acute psychiatric placement, which triggered the "tiebreaker" provision in the parties' Final Decree of Divorce.

- Dr. Abigail Nodler, [Jane's] treating psychiatrist, agreed with Petitioner Gavriella E. Roisman that [Jane] should be admitted in early March 2019 to The Menninger Clinic for emergency acute care and emergency long-term care planning.

### *i. Emergency health-care expense exception*

Among his appellate arguments, Dani asserts that the trial court abused its discretion in awarding Gavriella the Menninger health-care expenses because the expenses were not "emergency health-care expenses" as contemplated by the parties in the Agreed Divorce Decree. The decree does not define the phrase "health-care expenses" by itself but does define the phrase "reasonable and necessary health-care expenses not paid by insurance and incurred on behalf of the child" to include charges for "mental health-care services." The Agreed Divorce Decree also does not define the term "emergency," which modifies "health-care expenses."

The Supreme Court of Texas has made clear that "[t]he goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain

49

language they used." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). "Language used by parties in a contract should be accorded its plain, grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated." *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985). "'Plain meaning' is a watchword for contract interpretation because word choice evinces intent." *Primo*, 512 S.W.3d at 893 (quoting *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010)). A term's meaning "when used in a contract, depends largely on the kind and character of the contract, its purposes and circumstances, and context." *Id.* at 894 (citation omitted).

We may look to dictionaries to discern the meaning of a commonly used term not defined in a contract. *In re Davenpor*t, 522 S.W.3d 452, 457 (Tex. 2017). Cambridge Dictionary defines "emergency" as "a dangerous or serious situation, such as an accident, that happens suddenly or unexpectedly and needs immediate action." *Emergency*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/emergency (last visited February 6, 2022). Similarly, Merriam-Webster Dictionary defines "emergency" as "an unforeseen combination of circumstances or the resulting state that calls for immediate action. *Emergency*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/emergency (last visited February 6, 2022). Here, the decree uses the term "emergency" to modify "health-care expenses." The dictionary defines

"emergency," when used as an adjective, to mean "done very quickly because there is an emergency" or "intended to help deal with an emergency." *Emergency*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/ emergency (last visited February 6, 2022).

Applying these commonly understood definitions, an emergency health-care expense would be an expense incurred quickly to address a dangerous or serious unexpected health condition requiring immediate action. The appropriateness of this definition becomes apparent when its context and purpose are considered.

As discussed, the phrase appears in the following provision in the decree:

> Each party is ORDERED to use "preferred providers," or services within the health maintenance organization or preferred provider network, if applicable. . . Excepting emergency health-care expenses incurred on behalf of the children, if a party incurs health-care expenses for the children using "out-of-network" health-care providers or services . . . that party shall pay all (100%) of such health-care expenses incurred . . . .

The provision shows that the parties contracted to use only in-network providers for their children's health care. They agreed that, if one of them uses an out-of-network provider, then he or she is responsible to pay all the expenses incurred for that provider. However, the parties agreed to exclude from this requirement health-care expenses incurred because one of their children experience a health-care emergency. Given the context, the obvious purpose of the exception is to facilitate a parent's quick action to obtain health care for a child experiencing a

51

dangerous or serious unexpected health condition or situation requiring immediate action—i.e., an emergency—without the parent being encumbered by the need to locate an in-network provider. Unburdening a parent from locating an in-network provider to obtain treatment for a child's emergency not only serves to facilitate immediate action to treat an emergency health-care issue but also encourages it.

In its conclusions of law, the trial court ruled that, "[i]n early March 2019 [Jane] faced a psychiatric emergency that required immediate action by her parents," but the trial court did not acknowledge Gavriella's failure to take immediate action to address Jane's psychiatric emergency. The trial court further concluded that, because Jane's circumstances constituted an emergency "as contemplated" by the decree, Gavriella "was free to choose the best available and most appropriate psychiatric and mental-health care interventions for [Jane] regardless of the providers' 'network' status for insurance coverage purposes," but the trial court did not address Gavriella's five to six day delay in obtaining care for Jane by choosing Menninger. During that time, Jane rejected three in-network hospitals proposed by Dani that had available space for Jane. While waiting for a bed to open at Menninger, Gavriella also took Jane to Dallas and allowed her to stay with a friend where she shaved her head.

Dani asserts that the trial court incorrectly concluded that Jane's circumstances constituted an "emergency." He contends that, in late February to

52

early March 2019, Jane needed "urgent" psychiatric care but not "emergency" psychiatric care. However, as found by the trial court, Dr. Nodler provided expert testimony indicating that Jane was experiencing a "psychiatric emergency." And the evidence showed that, at the time, Dani believed that Jane needed immediate in-patient care because she was not safe at home. Assuming that Jane was experiencing an emergency, we agree with the trial court's conclusion that Gavriella was not required to choose an in-network provider to address the emergency, but we nonetheless disagree that the expenses Gavriella incurred at Menninger were "emergency health-care expenses."

While the decree does not require a parent to use an in-network provider to address a child's emergency, an expense will not meet the definition of an "emergency health-care expense" unless the parent acts quickly to obtain treatment for the child thereby incurring the expense. To allow a parent to delay treatment of a child's health-care emergency, foregoing available treatment, in order to obtain the best, preferred treatment would undermine the purpose of the emergency exception to facilitate and encourage immediate action to address a child's health-care emergency. And, if parties are allowed to recover their out-of-network expenses incurred under such circumstances, there would be little incentive for a party to sign a decree containing an exception for emergency health-care expenses.

Here, because Gavriella did not act quickly and take immediate action to address Jane's psychiatric emergency, we conclude that the expenses she incurred for Jane's treatment at Menninger were not "emergency health-care expenses." We hold that the trial court abused its discretion to the extent that it awarded Gavriella arrearages for the Menninger health-care expenses based on the emergency health-care expense exception.

## ii. Tie-breaker provision

Dani also contends that the tie-breaker provision in the Agreed Divorce Decree cannot serve as a basis to support the trial court's arrearages award to Gavriella for the Menninger health-care expenses. In its findings of fact, the trial court found that, in early March 2019, Dani and Gavriella "disagreed as to the proper location for [Jane's] acute psychiatric placement, which triggered the 'tiebreaker' provision." The trial court also found that Dr. Nodler agreed with Gavriella that Jane "should be admitted in early March 2019 to The Menninger Clinic for emergency acute care and emergency long-term care planning." In its conclusions of law, the trial court determined that, "because the parties' 'tiebreaker' psychiatrist recommended the precise course of action that was ultimately followed, [Gavriella] was free to choose the best available and most appropriate psychiatric and mental-health care interventions for [Jane] regardless of the providers' 'network' status for insurance coverage purposes."

Dani contends that the tie-breaker provision does not negate the provision allocating 100 percent of out-of-network health-care expenses to the incurring party." We agree.

In the decree, Dani and Gavriella are appointed as the children's joint managing conservators. Pursuant to the Family Code, a parent appointed as a conservator of a child has, during the parent's period of possession, the right to consent to the child receiving medical care not involving an invasive procedure, unless limited by court order. *See* TEX. FAM. CODE § 153.074(3). Here, the decree provides that Dani and Gavriella have the right to consent to the children's medical care not involving an invasive procedure during their respective periods of possession. The decree also provides that each parent has the right to consent to psychiatric and psychological treatment of the children, but that right is "subject to the agreement of the other parent conservator."

When Dani and Gavriella cannot agree, the tie-breaker provision, also found in the section of the decree pertaining to conservatorship issues, is triggered. The provision states, "[I]n the event the parties do not reach mutual agreement on decisions regarding psychiatric treatment of [Jane] (other than in an emergency), then the parties shall follow the recommendation of [Jane's] treating psychiatrist, Abigail Nodler, M.D." The provision does not address how expenses will be split for Jane's psychiatric treatment if the tie-breaker provision is triggered, nor does it

indicate that the provisions in the decree specifically addressing how health-care expenses are allocated do not apply when the provision is used. Instead, the tie-breaker provision focuses on Jane's psychiatric treatment.

The decree specifically addresses who must pay for out-of-network health-care expenses. The decree requires that the party incurring the out-of-network health-care expense pay 100 percent of that expense. The decree provides only three exceptions to this requirement: (1) the expenses are emergency health-care expenses; (2) the parties agree in writing to a different allocation of out-of-network expenses; or (3) further order of the court. Gavriella intimates that the tie-breaker provision implies an additional exception. We disagree.

"A contract's plain language controls, not what one side or the other alleges they intended to say but did not." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019) (internal quotation marks and brackets omitted); *see Union Pacific R.R. v. Novus Int'l, Inc.*, 113 S.W.3d 418, 421 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("We glean intent from what the parties said in their contract, not what they allegedly meant."). Contrary to Gavriella's construction, the decree does not provide an additional exception for out-of-network health-care expenses other than the three listed. And we cannot add language to a contract under the guise of interpretation. *LG Ins. Mgmt. Servs., L.P. v. Leick*, 378 S.W.3d 632, 638 (Tex. App.—Dallas 2012, pet. denied); *see Am. Mfrs.*

*Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) ("[W]e may neither rewrite the parties' contract nor add to its language.").

Both sides point out that we must "consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). "No single provision taken alone will be given controlling effect." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

Reading the entire decree and giving effect to all its language, we conclude that the tie-breaker provision does not function as an exception to the requirement that the party incurring out-of-network health-care expenses must pay for those expenses. The tie-breaker provision operates to resolve disagreements pertinent to the conservatorship issue of what psychiatric treatment Jane should receive. The provision addressing out-of-network health-care expenses operates to resolve who pays those out-of-network expenses. Construing the tie-breaker provision as an exception to the provision addressing out-of-network expenses would give the tie-breaker provision controlling effect, which is not permissible. *See id.* But giving effect to the provision addressing out-of-network expenses would not have controlling effect over the tie-breaker provision. The two provisions can be harmonized, and both given effect. Thus, because no exception applies, Gavriella

was required to bear 100 percent of the health-care expenses she incurred at Menninger. The trial court abused its discretion when it confirmed the Menninger arrearages of $10,085.55 and rendered a cumulative money judgment to include that amount.

We overrule Dani's first issue to the extent that he challenges the arrearages award of $34,547.79 for the health-care expenses Gavriella incurred at Visions, but we sustain Dani's first issue to the extent he challenges the arrearages award for $10,085.55 for the health-care expenses Gavriella incurred at Menninger.

## Attorney's Fees

In his second issue, Dani asserts that "[t]he judgment for attorney's fees must be vacated because there was no child support violation to support the judgment." Dani contends that, because the trial court erroneously determined that he owes Gavriella medical child support for the expenses she incurred at Visions and at Menninger, the trial court could not order him to pay $12,500 in attorney's fees under penalty of contempt. In short, Dani's second issue is predicated on the complete success of his first issue.

Family Code section 157.167(a) provides:

> If the court finds that the respondent has failed to make child support payments, the court shall order the respondent to pay the movant's reasonable attorney's fees and all court costs in addition to the arrearages. Fees and costs ordered under this subsection may be enforced by any means available for the enforcement of child support, including contempt.

58

TEX. FAM. CODE § 157.167(a).

Because, as discussed above, the trial court did not abuse its discretion in finding that Dani failed to pay medical child support to Gavriella with regard to the arrearages that he owed for the Visions health-care expenses, the trial court was required under Family Code section 157.167(a) to order Dani to pay Gavriella's reasonable attorney's fees, which are enforceable by contempt. *See id.* Thus, the trial court did not err when it ordered Dani to pay attorney's fees, and we reject Dani's request to vacate the attorney's fees award.[7] *See id.*

We overrule Dani's second issue.

## Conclusion

In the appeal (appellate cause no. 01-21-00093-CV), we modify the cumulative money judgment for the medical child support arrearages to reflect the

---

[7] We note that, as described in the background section above, the trial court did not hold Dani in contempt for failing to pay attorney's fees. The order adjudged Dani in contempt for eight violations of failing to pay medical child support. The trial court ordered Dani confined to jail for 180 days for each of the eight violations unless he paid both the ordered medical child support he owed and the ordered attorney's fees. The trial court suspended Dani's commitment to jail if he paid the medical child support and the attorney's fees by specified dates. In the mandamus proceeding, we have ordered the trial court to vacate the portion of the enforcement order holding Dani in contempt for failing to pay medical child support, thereby removing the contempt for which punishment was assessed.

59

amount of $34,547.79 instead of $44,633.34, and we affirm the enforcement order as modified, including the attorney's fee award.[8]

In the original proceeding (appellate cause no. 01-20-00828-CV), we conditionally grant Dani's mandamus petition and direct the trial court to vacate its order, contained in the enforcement order, holding Dani in contempt for failing to pay medical child support. Our writ will issue only if the court fails to comply. We lift the stay imposed by this Court's December 21, 2020 order.

Richard Hightower
Justice

Panel consists of Justices Hightower, Countiss, and Guerra.

---

[8]    The order holding Dani in contempt for failing to pay medical child support is not part of the appeal and not part of the affirmance.